# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 19-1904V**
**Filed: July 14, 2026**

GEORGE MOORE,

Petitioner,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES,

Respondent.

Special Master Horner

*Ronald Craig Homer, Conway, Homer, PC, Boston, MA, for petitioner.*
*Lynn Christina Schlie, U.S. Department of Justice, Washington, DC, for respondent.*

## RULING ON ENTITLEMENT[1]

On December 17, 2019, petitioner, George Moore, filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that he suffered a neurologic demyelinating injury caused by the influenza ("flu") vaccination that he received on October 10, 2017. (ECF No. 1.) In his motion for a ruling on the written record, he further specifies that the injury he alleges is transverse myelitis ("TM"). (ECF No. 77, p. 1.) For the reasons set forth below, I conclude that petitioner is entitled to an award of compensation.

### I. Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines. In general, to gain an award, a petitioner must make a number of factual demonstrations,

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] All references to "§ 300aa" below refer to the relevant section of the Vaccine Act at 42 U.S.C. § 300aa-10-34.

including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious or long-standing injury; and has received no previous award or settlement on account of the injury. Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury. In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury." That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table. If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination. § 300aa-13(a)(1); § 300aa-11(c)(1)(C)(i); § 300aa-14(a).

In many cases, however, the vaccine recipient may have suffered an injury *not* of the type covered in the Vaccine Injury Table. In such instances, an alternative means exists to demonstrate entitlement to a Program award. That is, the petitioner may gain an award by showing that the recipient's injury was "caused-in-fact" by the vaccination in question. § 300aa-13(a)(1)(B); § 300aa-11(c)(1)(C)(ii). In such a situation, of course, the presumptions available under the Vaccine Injury Table are inoperative. The burden is on the petitioner to introduce evidence demonstrating that the vaccination actually caused the injury in question. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005); *Hines ex rel. Sevier v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1525 (Fed. Cir. 1991). In this case, petitioner has not alleged an injury that appears on the Vaccine Injury Table. 42 C.F.R. § 100.3(a). Therefore, petitioner must demonstrate causation-in-fact.

The showing of causation-in-fact must satisfy the "preponderance of the evidence" standard, the same standard ordinarily used in tort litigation. § 300aa-13(a)(1)(A); *see also Althen*, 418 F.3d at 1278-79; *Hines*, 940 F.2d at 1525. Under that standard, petitioner must show that it is "more probable than not" that the vaccination was the cause of the injury. *Althen*, 418 F.3d at 1279. He need not show that the vaccination was the sole cause but must demonstrate that the vaccination was at least a "substantial factor" in causing the condition at issue and was a "but for" cause. *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999). Thus, petitioner must supply "proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Althen*, 418 F.3d at 1278 (quoting *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992)). Ultimately, petitioner must satisfy what has come to be known as the *Althen* test, which requires: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury. *Id.*

A petitioner may not receive a Vaccine Program award based solely on his or her assertions; rather, the petition must be supported by either medical records or by the

opinion of a competent physician. § 300aa-13(a)(1). Medical records are generally viewed as particularly trustworthy evidence because they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, medical records and/or statements of a treating physician's views do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. § 300aa-13(b)(1). A petitioner may rely upon circumstantial evidence. *See Althen*, 418 F.3d at 1280. Moreover, the *Althen* court noted that a petitioner need not necessarily supply evidence from medical literature supporting petitioner's causation contention, so long as the petitioner supplies the medical opinion of an expert. *Id*. at 1279-80. While scientific certainty is not required, that expert's opinion must be based on "sound and reliable" medical or scientific explanation. *Boatmon v. Sec'y of Health & Human Servs*., 941 F.3d 1351, 1359 (Fed. Cir. 2019).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record but are empowered to determine the format for taking evidence based on the circumstances of each case, including having the discretion to decide cases without an evidentiary hearing. Vaccine Rule 3(b)(2); Vaccine Rule 8(a); Vaccine Rule 8(d). Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties. Vaccine Rule 8(b)(1).

## II. Procedural History

Petitioner initially filed medical records marked as Exhibits 1-18 along with a signed statement marked as Exhibit 19. (ECF Nos. 6-10.) He then filed additional medical records marked as Exhibit 20. (ECF No. 13.) The case was first assigned to a different special master in January of 2020. (ECF Nos. 15-16.) After respondent identified further outstanding records (ECF No. 19), petitioner filed additional medical records and a workers' compensation file between October and November of 2020 (ECF Nos. 21, 25-26; Exs. 21-26).

On February 10, 2021, respondent filed his Rule 4(c) Report, recommending against compensation. (ECF No. 30.) In addition to contesting causation-in-fact with respect to any demyelinating injury that may be present, he also argued as a threshold matter that petitioner's medical records did not clearly reflect a demyelinating injury, such as TM, given that his treating physicians had questioned whether he may instead have suffered a spinal cord infarct. (*Id*. at 12-13.)

In January of 2022, petitioner filed an expert report by neurologist and radiologist Rohit Bakshi, M.D., M.A.[3] (ECF No. 37; Exs. 27-32.) Based on a review of petitioner's MRI reports and imaging, as well as considering petitioner's clinical history, Dr. Bakshi opined that petitioner's condition is consistent with an acute TM at C2-T2. (Ex. 27, p. 4.) Noting that onset of petitioner's condition occurred 54 days after the flu vaccination at issue, Dr. Bakshi further opined that petitioner's TM was vaccine-caused. (*Id.* at 4-5.) After filing Dr. Bakshi's report, petitioner filed further medical records. (ECF No. 40; Exs. 33-34.)

In response, respondent filed two expert reports in August of 2022. (ECF No. 44; Exs. A-D.) On respondent's behalf, neuroradiologist William Zucconi, D.O.,[4] disagreed with Dr. Bakshi's interpretation of the MR imaging. (Ex. C, pp. 5-7.) Instead, he interpreted the MRI results as supporting "a very likely diagnosis of spinal cord infarct (SCI), rather than TM." (*Id.* at 7.) Neurologist Raymond Price, M.D.,[5] additionally

[3] Dr. Bakshi received his medical degree from the University at Buffalo, State University of New York in 1991. (Ex. 28, p. 1.) He completed an internship in internal medicine at Massachusetts General Hospital and Harvard Medical School, followed by a residency in neurology at the University of California, Los Angeles Medical Center. (*Id.*) Thereafter, Dr. Bakshi completed a neuroimaging fellowship at the Dent Neurologic Institute in Buffalo, New York. (*Id.*) Currently, Dr. Bakshi serves as the Jack, Sadie & David Breakstone Endowed Chair and Professor of Neurology and Radiology at Harvard Medical School. (*Id.* at 2; Ex. 27, p. 1.) Additionally, Dr. Bakshi serves as the Director of the Laboratory of Neuroimaging Research and a senior neurologist at the Brigham Multiple Sclerosis Center, Ann Romney Center for Neurologic Diseases, Brigham and Women's Hospital, and Mass General Brigham. (Ex. 27, p. 1; Ex. 28, pp. 2-3.) He maintains his license to practice medicine in Massachusetts, is board-certified in neurology, and is certified as a diplomate in neuroimaging by the American Society of Neuroimaging and the United Council for Neurologic Subspecialities. (Ex. 28, p. 2; Ex. 27, p. 1.) Dr. Bakshi has held several national leadership positions in the field of neuroimaging, including past service as the Chair of the Neuroimaging Section of the American Academy of Neurology and President of the American Society of Neuroimaging. (Ex. 27, p. 1; Ex. 28, pp. 3-4.) He currently serves as the editor-in-chief of the Journal of Neuroimaging and has coauthored over 270 peer-reviewed publications. (Ex. 28, pp. 25-47; Ex. 27, p. 1.)

[4] Dr. Zucconi earned his Doctor of Osteopathic Medicine from New York College of Osteopathic Medicine in 2001. (Ex. D, p. 1.) He went on to complete a transitional internship at New York Hospital Queens, followed by a residency in radiology at Stony Brook University Hospital, where he served as chief resident in his final year. (*Id.* at 2.) Thereafter, Dr. Zucconi completed a neuroradiology fellowship at Mount Sinai Medical Center in New York City. (*Id.*) He is board-certified in radiology with added qualification in neuroradiology. (*Id.*; Ex. C, p. 1.) Previously, Dr. Zucconi served as an Associate Professor of Radiology & Biomedical imaging and as Section Chief of Neuroradiology at Yale University School of Medicine. (Ex. C, p. 1.; Ex. D, p. 2.) Currently, he serves as an Associate Professor of Radiology at Dartmouth Geisel School of Medicine and as a staff neuroradiologist at Dartmouth Health. (Ex. G, p. 1.) He has coauthored seven peer-reviewed publications, and he estimates he has been involved in the care of at least 30-40 patients with transverse myelitis. (*Id.* at 11; Ex. C, p. 1.)

[5] Dr. Price earned his medical degree from the University of Pennsylvania School of Medicine in 2004. (Ex. B, p. 1.) Thereafter, he completed an internship in internal medicine, a residency in neurology, and a fellowship in clinical neurophysiology with a neuromuscular focus at the University of Pennsylvania. (*Id.*) Dr. Price maintains his medical license in Pennsylvania and is board-certified in neurology with added qualification in neuromuscular medicine and is also board-certified in electrodiagnostic medicine. (*Id.* at 2; Ex. A, p. 1.) He has held various academic appointments at the University of Pennsylvania School of Medicine, where he currently serves as a Professor of Clinical Neurology. (Ex. B, p. 1.) Additionally, Dr. Price currently serves as Neurology Residency Director and Co-Director of the Neurohospital Division at the University of Pennsylvania. (*Id.*) In his clinical practice, Dr. Price has cared for hundreds of patients

opined that petitioner's condition does not meet the diagnostic criteria for TM and further opined that, especially when considering petitioner's pre-existing risk factors, SCI is more likely than not the cause of petitioner's symptoms. (Ex. A, pp. 7-11.)

Petitioner was directed to file a responsive report by Dr. Bakshi, but petitioner ultimately advised that Dr. Bakshi had become unavailable to continue with the case. (ECF Nos. 47-48.) Instead, in June of 2023, petitioner filed an expert report by neurologist Carlo Tornatore, M.D.[6] (ECF No. 50; Exs. 35-55.) Dr. Tornatore continued to maintain on petitioner's behalf that he suffered TM caused-in-fact by his flu vaccine administered 54 days prior. (Ex. 35, p. 18.) In addition, petitioner filed an expert report by neuroradiologist Richard Bajakian, M.D.[7] (ECF No. 53; Exs. 56-57), who opined that, although MR imaging is often not entirely specific for either TM or SCI, petitioner's initial MRI finding was such that it would have required multiple occluded vessels, which is extremely unlikely, and further opined that SCI does not correlate to petitioner's clinical presentation. (Ex. 56, p. 18.)

In December of 2023, respondent filed responsive reports by Drs. Zucconi and Price. (ECF Nos. 55-56; Exs. E-G.) Petitioner then filed a further report by Dr. Tornatore in March of 2024 (ECF No. 58; Exs. 62-72) and a further report by Dr. Bajakian in April of 2024 (ECF No. 61; Exs. 73-88). Respondent again responded with a report by Dr. Price (ECF No. 64; Ex. H), which was then followed by a further report by Dr. Tornatore (ECF No. 67; Exs. 89-96). Petitioner then filed updated medical records in October of 2024. (ECF No. 69; Exs. 97-100.)

---

with myelopathies, including spinal cord infarction and longitudinally extensive transverse myelitis. (Ex. A, p. 1.)

[6] Dr. Tornatore received his medical degree from Georgetown University School of Medicine in 1986. (Ex. 36, p. 2.) Thereafter, he completed an internship in internal medicine at Providence Hospital in Washington D.C., a residency in neurology at Georgetown University Hospital, and a fellowship in molecular virology at the National Institutes of Health in Bethesda, Maryland. (*Id.*) Dr. Tornatore is board-certified in neurology. (Ex. 36, p. 1; Ex. 35, p. 2.) Currently, Dr. Tornatore serves as Professor and Chairman of the Department of Neurology at Georgetown University Medical Center as well as Chairman and Neurologist-in-Chief of the Department of Neurology at Medstar Georgetown University Hospital. (*Id.* at 3; Ex. 35, p. 1.) In his clinical practice, Dr. Tornatore has treated thousands of patients with myelitis, including autoimmune-related transverse myelitis and spinal cord infarct-related myelitis. (Ex. 35, p. 2.) He has coauthored over 50 publications, with many articles focusing on multiple sclerosis and other autoimmune disorders. (Ex. 36, pp. 8-13; Ex. 35, p. 2.)

[7] Dr. Bajakian received his medical degree from New Jersey Medical School in 1984. (Ex. 57, p. 1.) He completed an internship in internal medicine at Monmouth Medical Center in Long Branch, New Jersey followed by a residency in diagnostic radiology at Morristown Memorial Hospital in Morristown, New Jersey. (*Id.*) Thereafter, Dr. Bajakian completed a fellowship in neuroradiology at Harvard Medical School. (*Id.*) He is board-certified in radiology with a certificate of additional qualification in neuroradiology. (*Id.* at 2.) After completing his fellowship, Dr. Bajakian worked as an attending radiologist and Director of Neuroradiology at JFK Medical Center in Atlantis, Florida. (*Id.* at 1.) In 2002, he opened an outpatient imaging center, MRI Specialists, where he worked as a neuroradiologist until 2021. (*Id.*; Ex. 56, p. 1.) During that time, Dr. Bajakian performed a multitude of MRI and CT studies, with a focus on spinal imaging. (Ex. 56, p. 1.) He presently works as a consultant. (*Id.*) Dr. Bajakian has coauthored eight peer-reviewed publications. (Ex. 57, p. 5.)

Thereafter, the parties advised in November of 2024 that they wished to resolve the case via written briefs (Informal Remark, filed on Nov. 1, 2024), and the presiding special master set a briefing schedule (Non-PDF Scheduling Order, filed on Nov. 1, 2024). However, before the parties filed their briefs, the case was reassigned to the undersigned on February 13, 2025. (ECF Nos. 73-74.) Based on my review of the docket, the record, and the parties' subsequently filed briefs, I agree that the parties have had a full and fair opportunity to develop the record and that it is appropriate to resolve this case on the existing record. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020).

Petitioner filed his motion for a ruling on the written record on March 7, 2025. (ECF No. 77.)[8] In his motion, petitioner argues extensively in favor of a diagnosis of TM (*Id*. at 59-86) before then advancing an analysis under the *Althen* test that is premised on the presence of a demyelinating disease such as TM (*Id*. at 87-108). And, finally, petitioner argues that respondent has not preponderantly demonstrated that SCI would constitute a factor unrelated to petitioner's vaccination as the cause of his condition. (*Id*. at 108-111.)

In his response, respondent first argues that petitioner has not preponderantly demonstrated that he suffered TM, contending that SCI is instead a more likely diagnosis. (ECF No. 79, pp. 15-31.) Respondent stresses that petitioner bears the burden of proof to establish that he more likely than not suffered TM. (*Id*. at 31 (citing *Lombardi v. Sec'y of Health & Human Servs*., 656 F.3d 1343, 1352 (Fed. Cir. 2011); *Broekelschen v. Sec'y of Health & Human Servs*., 618 F.3d 1339, 1349 (Fed. Cir. 2010).) Assuming *arguendo* that petitioner suffered TM, respondent additionally argues that petitioner has not met his burden of proof under any of the three parts of the *Althen* test. (*Id*. at 31-40.) In reply, petitioner disputes a number of points urged by respondent, both with respect to diagnosis and the *Althen* test.[9] (ECF No. 81.)

## III. Factual Summary

Petitioner's prior medical history includes type 2 diabetes, hyperlipidemia, hypertension, atrial fibrillation, gastroesophageal reflux disease ("GERD"), asthma, obstructive sleep apnea, and obesity. (Ex. 2, pp. 33-38; Ex. 10, pp. 174, 190-91.) A 2016 cardiac catheterization showed non-obstructive coronary artery disease. (Ex. 9,

---

[8] Petitioner's motion was 110 pages long and included a 45-page factual summary replete with extensive block quoting. This manner of briefing is not helpful.

[9] Petitioner advised in his motion reply that petitioner agreed to proceed via briefing based at least in part on the fact that the previously presiding special master's hearing calendar was full through the majority of 2026. (ECF No. 81, p. 27 n.16.) In light of the reassignment, petitioner noted he is amenable to holding an entitlement hearing if the court wished to do so. (*Id*.) However, the undersigned's hearing calendar is no less busy than that of the previously presiding special master. In any event, as noted above, I do not believe an entitlement hearing is necessary in this case given that the parties have had a full and fair opportunity to develop the record, this comment comes only upon completion of the briefing process, and petitioner's suggestion that he is "amenable" to such a hearing stops short of actually requesting one.

pp. 79-80.) He also had polycythemia vera (increased hemoglobin and hematocrit) secondary to testosterone treatment. (Ex. 8, pp. 35-36.) In January of 2017, he had an episode of transitory diplopia and was suspected to have had a transient ischemic attack ("TIA"). (Ex. 11, pp. 1-2.)

Petitioner received the flu vaccination at issue on October 10, 2017, during a hematology follow up. (Ex. 1.) He later had his annual physical on December 1, 2017, during which he discussed a number of complaints but had an unremarkable physical exam except for left shoulder pain. (Ex. 20, pp. 22-24.)

On December 4, 2017, emergency medical services ("EMS") were called to petitioner's home just before 3 AM. (Ex. 12, pp. 1-3.) When EMS arrived, petitioner reported that he was experiencing severe pain and pressure or muscle spasms on the left side of his back and left arm as well as bilateral weakness and numbness in the legs that prevented him from ambulating. (*Id*. at 2.) He indicated that he had some muscle cramping on the left side of his back and left arm the day prior. (*Id.*) Petitioner was transported to the emergency department and was given Versed[10] during transit. (*Id*.; Ex. 7, p. 121.)

When petitioner arrived at UNC Johnston Medical Center Emergency Department ("ED"), he complained of upper back pain and chest pain that woke him from his sleep around 2 AM.[11] (Ex. 7, p. 121.) Petitioner specified that the pain was located in the mid-thoracic area of his back and described the pain "as a pressure-like sensation." (*Id.*) Additionally, petitioner complained of bilateral lower extremity numbness and weakness. (*Id.*) He reported that he had taken a fall while going up the stairs two days ago, on December 2, 2017. (*Id.* at 121, 129.) Petitioner denied sustaining any injury or trauma, noting that he was able to "get right back up" and that he was able to work the next day symptom-free and without any issues. (*Id.* at 129.) The treating physician assistant documented that petitioner's physical examination was normal other than musculoskeletal tenderness that was not otherwise specified. (*Id.* at 123.) Given petitioner's significant cardiac history, the physician assistant documented that the plan was to rule out cardiac involvement and then evaluate for acute processes. (*Id.* at 124.)

---

[10] Versed refers to brand name preparation of midazolam, which is "a benzodiazepine used an antianxiety agent and muscle relaxant" that is administered either intravenously or intramuscularly. *Versed*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=52935 (last visited June 12, 2026); *Midazolam*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=31529 (last visited June 12, 2026).

[11] However, a separate nursing note documented that petitioner reported that around 6 PM on December 3, 2017, he experienced a rapid onset of pain in his upper back, chest, and shoulders and developed lower leg pain and numbness 3-4 hours later. (Ex. 7, p. 129.) A different nursing note alternatively suggests that petitioner's symptoms did not start until the morning of December 4, 2017, when he began to experience back spasms. (*Id*. at 130.)

Petitioner's laboratory studies, chest x-ray, and EKG were normal.[12] (Ex. 7, p. 124-25.) He underwent a CT of the thoracic and lumbar spine without contrast, which were both negative. (*Id.* at 124-27.) After ruling out cardiac involvement and acute processes such as fracture and abscess, petitioner's treating providers initially planned on discharging petitioner home. (*Id.* at 125.) However, on discharge, petitioner was unable to stand and reported that his legs felt weak and rubbery as well as a new onset of weakness in his upper extremities. (*Id.*) Additionally, nurses in the ED documented that petitioner attempted to ambulate to the restroom but slid to the floor as his legs gave out and that petitioner reported lacking the control and muscle strength to urinate. (*Id.* at 128-29.) Accordingly, petitioner underwent an MRI of the lumbar spine without contrast and a CT of the head without contrast, which were negative. (*Id.* at 125, 127-28, 137.) Petitioner was transferred to UNC Rex Hospital for a neurological evaluation of his ascending lower extremity weakness. (*Id.* at 126.)

Later that day, petitioner was admitted to UNC Rex Hospital with a chief complaint of weakness. (Ex. 6, p. 16.) In recording petitioner's history, the admitting hospitalist noted that petitioner reported taking a fall two days ago, although he denied experiencing any significant pain or injury from that event. (*Id.*) Petitioner explained that his symptoms began the day prior around 6 PM, when

> he started getting tightness in his chest and upper back as well as pain in his shoulders. About 2 AM he had to get up to go to the bathroom and noticed that his legs felt like rubber. He says he was weaker in the left leg [than] on the right and had to hold on to furniture to get to the bathroom. He described numbness and weakness in the legs. He had some difficulty urinating, which is unusual for him. He was able to take a shower by leaning up against the shower wall but as he had difficulty walking[,] his wife called 911 and he was transported to [the ED].

(*Id.*) On physical exam, petitioner's strength was 5/5 in the bilateral upper extremities, 4/5 in the right leg, and 3/5 in the leg, and his deep tendon reflexes were documented as absent in the ankle, diminished in his right patella and biceps bilaterally, and brisk in the left patella. (*Id.* at 19.) Additionally, the provider noted that petitioner was unable to pull himself up in bed from a supine position. (*Id.*) The admitting provider documented that the etiology of petitioner's progressive weakness was unclear, although likely not related to petitioner's fall two days prior. (*Id.* at 15.) Although petitioner's treating providers in the ED transferred petitioner due to concern for possible Guillain-Barré Syndrome ("GBS"), the admitting provider documented that petitioner did not fit the classic pattern for GBS. (*Id.*) Neurology was consulted. (*Id.*)

Shortly after his admission to UNC Rex Hospital on December 4, 2017, petitioner was examined by the neurology team. (Ex. 6, p. 53.) He was evaluated by Suzanne Hartmann, nurse practitioner ("NP"), who documented that petitioner presented with ascending bilateral lower extremity weakness associated with thoracic radicular

---

[12] Petitioner's EKG did evidence a right bundle branch block; however, this was a pre-existing and known issue. (Ex. 7, p. 124.)

symptoms and urinary retention as well as a past medical history significant for diabetes, polycythemia vera, and paroxysmal atrial fibrillation. (*Id.* at 54.) Petitioner reported that his symptoms began the prior evening around 8 PM when he experienced thoracic spasms and tingling. (*Id.*) Additionally, petitioner stated that his weakness continued to worsen to the point where he needed to support himself with furniture to walk. (*Id.*) NP Hartmann also documented that petitioner was unable to empty his bladder in the ED, which led to placement of a foley catheter. (*Id.*) Petitioner's physical exam revealed ataxia with heel-to-shin testing and 4/5 strength with the exception of the bilateral hip flexors, which were 3/5. (*Id*. at 56.) His deep tendon reflexes were preserved and documented as "2+ patellars, otherwise 1+." (*Id.* at 54, 56-57.) Petitioner's sensory exam revealed altered pinprick and temperature perception worse in the left leg compared to the right. (*Id.* at 57.) However, NP Hartmann was unable to isolate a specific sensory level. (*Id.*) Petitioner's blood pressure was documented as 112/70 with a mean arterial pressure of 102. (*Id.* at 56.) The plan was for petitioner to undergo a lumbar puncture and MR imaging of the head and cervical and thoracic spines. (*Id.* at 54.) Additionally, NP Hartmann ordered labs to check for reversible causes of weakness, including vitamin B12 and hemoglobin A1C, and documented that petitioner's negative inspiratory force ("NIF") would be monitored. (*Id.*)

Later that day, petitioner underwent a lumbar puncture. (Ex. 6, p. 216.) Analysis of petitioner's cerebrospinal fluid ("CSF") revealed elevated protein, glucose, and RBC as well as slightly elevated lymphocytes in one of the two test tubes. (*Id.* at 6, 45, 246-47.) Petitioner's lactate and hemoglobin A1C levels were elevated, and his vitamin B12 levels were normal. (*Id.* at 241, 247.)

At 1:35 AM on December 5, 2017, a nurse documented that she notified the hospitalist team of petitioner's new complaint of numbness in his torso and "paralysis creeping up his body." (Ex. 6, p. 635.) The nurse noted that Dr. Cook was made aware of the change; however, no new orders were provided. (*Id.*) In the hospitalist service progress note dated December 5, 2017, the provider noted that petitioner "[f]eels as though dysesthesia/numbness has crept up higher from yesterday." (*Id.*) Although petitioner had good sensation from the T4 dermatome and up, he stated that "everything else feels 'dead.'" (*Id.* at 174-75.) Throughout the day on December 5, 2017, petitioner was noted to have persistent hypotension. (*Id.* at 164, 635; *see also id.* at 1239-41 (flowsheets documenting petitioner's vital signs).) Petitioner received three normal saline boluses at approximately 7:00 AM, 7:00 PM, and 11:00 PM respectively. (*Id.* at 1245.)

The neurology team followed up with petitioner on December 5, 2017. Eric Kirch, physician assistant ("PA"), documented that petitioner's symptoms began on December 3 and noted that petitioner's weakness in his bilateral lower extremities had progressed to the point where he could no longer move them, with petitioner reporting "[m]y legs are dead." (Ex. 6, p. 165.) Additionally, PA Kirch recorded that petitioner was experiencing new weakness in his upper extremities, left greater than right. (*Id.*) On physical exam, petitioner's strength was measured at 3-4/5 in his right upper extremity, 3/5 in his left upper extremity, and 1/5 in his bilateral lower extremities. (*Id.* at 166.) His exam was

also significant for hyporeflexia, with trace deep tendon reflexes in his ankles and patellar. (*Id.*) Furthermore, PA Kirch documented that petitioner has diminished sensation from chest distally as well as a small degree of sensation loss in the hands. (*Id.* at 165.) After discussing petitioner's case with Dr. Carnes, a neuroradiologist, PA Kirch remarked that "[b]ased on progression of symptoms and loss of [deep tendon reflexes] in the lower extremities[,] will plan to start plasmapheresis unless MRI confirms the patient has transverse myelitis that would benefit from steroids and other structural spinal lesion." (*Id*.) PA Kirch ordered stat repeat MRIs of petitioner's cervical and thoracic spine with and without contrast. (*Id.*)

Later that day, petitioner underwent an MRI with and without contrast of the cervical and thoracic spine due his history of lower extremity weakness and urinary retention concerning for transverse myelitis. (Ex. 6, pp. 214-16.) The radiologist documented his impression as "[l]ongitudinal T2/STIR hyperintensity without enhancement involving the anterior spinal cord at the cervicothoracic junction (C6-T1), imaging appearance suggests early transverse myelitis (infectious or inflammatory), demyelinating disease (neuromyelitis optica), or an acute ischemic infarction." (*Id.* at 215.) Additionally, the MRI revealed degenerative changes of the low cervical spine with mild canal stenosis at C5-C6 and bilateral neural foraminal stenosis greater at C5-C6 than C6-C7. (*Id.*)

On December 6, 2017, the critical care medicine team was consulted due to petitioner's worsening hypotension and he was transferred to the ICU. (Ex. 6, pp. 45-47, 164.) At the time of the consultation, petitioner was noted to be more lethargic and had no sensation below his upper chest, although he could still move his left leg. (*Id.* at 164.) In documenting petitioner's history, the critical care medicine provider noted that petitioner was admitted to the hospitalist service for evaluation of possible GBS; however, his MRI was suggestive of early TM. (*Id.* at 45.) Throughout the day of December 5, petitioner experienced worsening hypotension with a systolic blood pressure measuring in the 70s. (*Id.*) While petitioner received three boluses of normal saline, his hypotension persisted. (*Id.*) Petitioner remained afebrile, but his lactic acid was elevated. (*Id.* at 45.) On physical exam, petitioner's upper extremity grip was 4/5 on the right and 2/5 on the left. (*Id.* at 46.) He was only able to wiggle his toes in his left lower extremity with no movement of the right lower extremity. (*Id.*) The consulting provider's assessment included TM. (*Id.*) The supervising critical care attending documented "I agree with the history and exam as outlined. His neurological defect appears to be secondary to a cervical transverse myelopathy and not a vascular event related to p vera. He is admitted to the ICU for observation out of concern for impending respiratory insufficiency or autonomic instability." (*Id.* at 45.)

Later that day, petitioner underwent electrodiagnostic testing for evaluation of "Possible GBS." (Ex. 6, p. 573.) The performing provider remarked that petitioner's nerve conduction study "was slightly abnormal, but did not demonstrate findings to strongly support a diagnosis of acute peripheral demyelination." (*Id.*) The motor distal latencies and conduction velocities were normal or near normal, sensory responses were also normal, and there was no evidence of conduction block. (*Id.*) The provider

noted that the absence and delay of F wave responses was a nonspecific abnormality, although it could be seen in very early GBS. (*Id.*)

Neurology continued to follow petitioner while in the ICU. (Ex. 6, pp. 158-63.) On December 6, 2017, NP Hartmann assessed that petitioner's overall clinical picture, given the results of the nerve conduction study and neuroimaging, was consistent with transverse myelitis ("TM"). (*Id.* at 158.) The plan was to start petitioner on a five-day course of intravenous ("IV") Solu-Medrol, initiate plasma exchange therapy, and consult occupational and physical therapy. (*Id.* at 159.) She documented that petitioner's refractory hypotension may be secondary to autonomic dysfunction. (*Id.*)

Petitioner was started on PLEX and IV Solu-Medrol on December 6, 2017. (Ex. 6, pp. 45-46, 151-56, 164.) Petitioner's treating providers documented that petitioner experienced subjective and objective improvement of his neurological symptoms after initiating this treatment regimen. (*E.g.*, *id.* at 33, 146.) For example, on December 7, 2017, the neurology team documented that petitioner has some subjective improvement with sensation and that he was now able to dorsiflex his ankles. (*Id.* at 146.) Additionally, on December 8, 2017, petitioner reported that "[h]e thinks that his legs are stronger and that he has improved sensation." (*Id.* at 133.)

On December 8, 2017, petitioner underwent repeat MR imaging. (Ex. 6, pp. 213-14.) Petitioner's MRI of the cervical spine revealed "[n]onenhancing bilaterally symmetric T2 signal abnormality in the ventral spinal cord from the mid C6 level to T1-2 level." (*Id.* at 213.) Overall, the reading radiologist remarked that petitioner's cervical MRI was unchanged as compared to his initial MRI on December 5. (*Id.*) Petitioner also underwent an MRI of the brain with and without contrast which was largely negative with no specific evidence of demyelination or infarction.[13] (*Id.* at 213-14.)

Petitioner continued to receive PLEX and IV Solu-Medrol, and his providers continued to document improvement of petitioner's neurological symptoms. (*E.g.*, Ex. 6, pp. 26-27, 75, 125.) His treating providers continued to list TM as petitioner's principal diagnosis. (*E.g.*, *id.* at 6, 26, 71, 75, 77.) Petitioner was started on Midodrine, which improved his hypotension. (*Id.* at 27.) After a six-day course of IV Solu-Medrol, petitioner was transitioned to an oral steroid taper. (*Id.* at 75.) He completed his final PLEX treatment on December 15, 2017. (*Id.* at 68, 71.)

On December 16, 2017, petitioner was discharged from UNC Rex Hospital to WakeMed Rehabilitation for inpatient therapy. (Ex. 6, p. 5; Ex. 5, p. 15.) Petitioner's discharge summary documents TM has his principal diagnosis. (Ex. 6, p. 6.) The admitting provider at WakeMed Rehabilitation documented that petitioner reported falling on December 2, two days prior ED visit and hospital admission, after slipping while walking up steps that were wet from rain. (*Id.* at 3.) Petitioner stated that the next

[13] Petitioner's MRI of the brain did reveal "one tiny nonspecific focus of T2 hyperintensity in the cerebral white matter." (Ex. 6, p. 213.) However, the reading radiologist attributed this finding as likely evidence of very mild chronic microvascular ischemic changes, which was a typical finding given petitioner's age. (*Id.* at 214.)

day, December 3, he started to experience chest tightness followed by leg weakness and difficulty urinating that night. (*Id.*) Thereafter, petitioner started experiencing trouble walking, at which point his wife called EMS and he was transported to the ED. (*Id.*) During his hospitalization, petitioner underwent an MRI and a workup which was suggestive of TM, and he was treated with PLEX and IV Solu Medrol. (*Id.* at 3, 8.) Petitioner also experienced hypotension and bradycardia, which were thought to be secondary to autonomic dysfunction. (*Id.*) The admitting provider documented acute TM as the rehab diagnosis. (*Id.* at 2, 8.) On physical exam, petitioner had decreased strength in his upper and lower bilateral extremities and a sensory deficit, with numbness and tingling in his fingertips and toes. (*Id.* at 7.) Additionally, the admitting provider noted that petitioner required assistance with mobility. (*Id.* at 5.)

While at WakeMed Rehabilitation, petitioner underwent extensive interdisciplinary rehabilitation, inclusive of both physical and occupational therapy. (*See generally* Ex. 5, pp. 11-476.) Petitioner was discharged home on January 31, 2018, at which time he was noted to be neurologically stable. (*Id.* at 471, 475-76.) The discharge summary indicated that petitioner was making good gains with improving his gait dysfunction and completing activities of daily living. (*Id.* at 475.) At the time of discharge, petitioner was using a wheelchair and rolling walker for mobility, and he was instructed to continue with physical and occupational therapy on an outpatient basis. (*Id.* at 13, 18-19, 479.) TM was included among petitioner's discharge diagnoses. (*Id.* at 471.)

In February of 2018, petitioner underwent an initial evaluation for outpatient occupational and physical therapy. (Ex. 5, pp. 1178-81, 1205-13.) The records for both encounters list TM among petitioner's diagnoses. (*Id.* at 1178, 1205.) Petitioner continued to receive regular occupational and physical therapy throughout the spring of 2018. (*See generally id.* at 1245-3389.)

Petitioner presented to Raleigh Neurology Associates on March 6, 2018, for a hospital follow up. (Ex. 3, pp. 64-69.) At this encounter, petitioner was evaluated by Thinh Nguyen, NP, who documented that petitioner was hospitalized in December for nontraumatic weakness in the legs that progressed to the upper extremities, worse on the left compared to the right. (*Id.* at 64.) During his hospitalization, petitioner underwent a workup, which was suggestive of TM, and he was treated with IV Solu-Medrol and Plavix. (*Id.*) Additionally, petitioner developed episodes of hypotension during his hospitalization, which were thought to be secondary to autonomic instability. (*Id.*) At the time of the encounter, petitioner complained of leg weakness and hip pain down to his leg, trouble walking, numbness/burning in his feet, lack of bowel and bladder control, and "slow" thinking. (*Id.* at 67.) NP Nguyen assessed petitioner with disturbance of skin sensation, gait abnormality, weakness of bilateral extremities, and TM. (*Id.* at 69.)

On May 8, 2018, petitioner presented to neurologist David Konanc, M.D., for evaluation of his TM. (Ex. 3, pp. 46-49.) In documenting petitioner's history, Dr. Konanc noted that in December of 2017, petitioner was hospitalized for nontraumatic

weakness in the legs that progressed to the upper extremities and that his workup was suggestive of TM. (*Id.* at 46.) Additionally, petitioner experienced a 10-day episode of diplopia unassociated with any autonomic features, pain, or vision loss in February of 2017, which resolved by the time he sought care. (*Id.*) Dr. Konanc documented that petitioner

> has numerous cerebrovascular risk factors but did not have evidence of immune activation during the time that he experienced his episode of myelitis. The patient's symptoms evolved from a dysesthetic sensory level around T4 to paralysis with urinary retention and constipation within less than 8 hours. The patient has recovered a great deal of function but still has a significant sensory level at about T3. The patient has burning dysesthetic skin sensations below this level bilaterally. He has an asymmetric paraparesis with his right side being significantly weaker than his left side.

(*Id.*) Physical examination revealed decreased strength in petitioner's lower extremities, atrophy in petitioner's right calf muscle, bradykinesia and slow gait, slow and decreased coordination of the extremities, and decreased sensation to light touch in the extremities with a sensory level of T3. (*Id.* at 48.) Dr. Konanc assessed petitioner's TM as improving and documented within his impression that petitioner has a history of hemifacial spasm and suffered "a bout of transverse myelitis affecting predominantly the ventral aspect of his cord in December 2017." (*Id.* at 48-49.) While he noted that petitioner had experienced good recovery of function given the initial severity of injury and should thus continue with rehabilitation, Dr. Konanc indicated that petitioner may want to adjust the dosing of his medications to help control his neuropathic pain. (*Id.* at 49.) Furthermore, Dr. Konanc recommended that petitioner undergo repeat MR imaging "to make sure that there is no evidence of an autoimmune inflammatory process especially given his report of having previous diplopia although I think ischemic intranuclear ophthalmoplegia might also be in the differential for the previous episode. Would reassess after the above." (*Id.*)

In an outpatient physical therapy treatment note of May 10, 2018, the treating provider documented that petitioner "saw the neurologist who told him there is a possibility that he had a stroke in his spine instead of transverse myelitis." (Ex. 5, p. 2663.) Accordingly, petitioner reported that he was undergoing another MRI for further assessment. (*Id.*)

On May 16, 2018, petitioner had a follow up visit with cardiology. (Ex. 9, pp. 210-14.) The treating provider documented that since his last visit, petitioner had been hospitalized for TM. (*Id.* at 211.) Petitioner reported that he was undergoing an MRI the next day "to determine if he had a stroke in his spine." (*Id.* at 210.) Due to issues with hypotension during his hospitalization, petitioner's Ramipril was stopped, and he started on Midodrine, which petitioner was no longer on at the time of the encounter. (*Id.*) Petitioner complained of elevated blood pressure, and his blood pressure was high

on exam. (*Id.* at 211, 213.) The treating provider restarted petitioner on Ramipril and instructed petitioner to monitor his blood pressure twice daily. (*Id.* at 210-11.)

Petitioner underwent follow up MR imaging on May 17, 2018, which was compared to petitioner's prior MR imaging on December 8, 2017. (Ex. 17, pp. 2-10.) His MRI of the brain with and without contrast revealed no acute intracranial abnormality and a few faint peripheral white matter FLAIR hyperintensities, which were unchanged. (*Id.* at 2.) The reading radiologist noted that petitioner's faint hyperintensities "are not specifically characteristic for demyelinating disease" and may relate to small vessel degenerative change, migraine, or nonspecific gliosis. (*Id.*) Petitioner's MRI with and without contrast of the cervical and thoracic spine revealed that "[t]he previously seen irregular T2 and STIR hyperintensity in the ventral aspect of the spinal cord from C6-T1 levels has improved compared to prior, however there appears to be some subtle heterogenous T2 hyperintensity within the ventral cord at these levels which persists, particularly at the C7-T1 levels." (*Id.* at 4-6, 8-10.)

On June 7, 2018, petitioner returned to his outpatient neurology clinic to discuss the results of his MR imaging. (Ex. 3, pp. 3-6.) At this encounter, petitioner was evaluated by Beth Bingaman, NP. (*Id.* at 3.) After repeating the history of present illness documented in petitioner's May 8, 2018 encounter with Dr. Konanc and examining petitioner (*Id.* at 3-5), NP Bingaman documented that petitioner's MRI of the brain "was without acute findings and was without evidence of demyelinating disease (*Id.* at 6). With regard to petitioner's MRI of his cervical and thoracic spine, NP Binghaman remarked that the imaging revealed internal healing along with multi-level degenerative changes. (*Id.*) NP Bingaman recommended that petitioner continue with his current medication regimen and therapies, and that petitioner return to the clinic in December for reevaluation of his TM.[14] (*Id.*)

Petitioner was ultimately discharged from occupational therapy in July of 2018; however he continued to receive rehabilitation and care for his condition into 2021, including physical therapy, Botox injections, and consultation with urology for flaccid neurogenic bladder secondary to TM. (*See generally* Exs. 5, 18, 26, 33-34, 97, 100.) Some of petitioner's subsequent treatment records list the flu vaccine as an allergy and document TM as the reaction. (*See, e.g.*, Ex. 21, p. 33; Ex. 100, p. 186.) Although the undersigned has reviewed and considered all medical records filed in this case, summary of these subsequent treatment records is not necessary to resolve the issue of entitlement.

## IV. Expert Summary

Given the number of expert reports filed in this case, they are best understood chronologically.

---

[14] Based on the medical records filed in this case, it does not appear that petitioner followed up with neurology in December of 2018 as advised.

**a. Dr. Bakshi's initial report (Exhibit 27)**

Dr. Bakshi describes petitioner's clinical course as beginning approximately eight weeks post-vaccination with a rapid onset of pain wrapping around his chest, back and shoulder, which was followed by an acute onset of pain and numbness in his legs and then weakness and bowel and bladder dysfunction. (Ex. 27, pp. 3-4.) On December 5, 2017, his MRI showed a longitudinally extensive T2/STIR hyperintensity without enhancement, which involved most of the cervical spine and extended to the upper thoracic spine. (*Id*. at 4.) He notes that follow up imaging demonstrated improvement. (*Id*.)

Based on his own review of the MR imaging, Dr. Bakshi opines that petitioner's lesion is consistent with a transverse myelitis ("TM") at C2-T2. (Ex. 27, p. 4.) He explains that TM "refers to inflammation affecting the spinal cord that commonly leads to disturbances in motor, sensory and autonomic nervous system functioning. This inflammation results in demyelination (injury to and loss of the myelin sheath covering the nerve fibers)." (*Id.*) Dr. Bakshi further opines that petitioner's "clinical symptoms, CSF results, and MRI findings support this diagnosis."[15] (*Id*.) In particular, although petitioner still suffers significant impairment, his disease course was monophasic. (*Id*.) Moreover, his condition is not consistent with either multiple sclerosis ("MS") or neuromyelitis optica spectrum disorder ("NMOSD").

Dr. Bakshi characterizes TM as existing on "a spectrum of central nervous system inflammatory demyelinating disorders." (Ex. 27, p. 4.) It can result from direct infection of the spinal cord, but more often is autoimmune, either post-infectious or, he opines, post-vaccination. (*Id*.) Dr. Bakshi notes that he himself published a case report of TM following an influenza vaccination with symptom onset approximately four weeks. (*Id*. (citing Rohit Bakshi & John C. Mazziotta, *Acute Transverse Myelitis After Influenza Vaccination: Magnetic Resonance Imaging*, 6 J. NEUROIMAGING 248 (1996) (Ex. 30) (*see also* Ex. 44; Ex. A, Tab 3)).) Moreover, he asserts that published literature has associated TM with a variety of vaccinations, including a study by Pidcock et al., which found that 28% of cases of pediatric TM were preceded by a vaccination within the prior month compared to 47% being preceded by infection. (*Id*. (citing N. Agmon-Levin et al., *Transverse Myelitis and Vaccines: A Multi-Analysis*, 18 LUPUS 1198 (2008) (Ex. 29) (*see also* Ex. 45; Ex. A, Tab 1); F.S. Pidcock et al., *Acute Transverse Myelitis in Childhood: Center-Based Analysis of 47 Cases*, 68 NEUROLOGY 1474 (2007) (Ex. 32) (*see also* Ex. A, Tab 2)).) He notes that there are multiple proposed mechanisms by which autoimmunity is thought to occur, including both antigen specific mechanisms, such as molecular mimicry, and antigen non-specific mechanisms, such as bystander activation. (*Id*. at 4-5 (citing Julie K. Olson et al., *A Virus-Induced Molecular Mimicry Model of*

---

[15] In this motion response, respondent asserts that Dr. Bakshi incorrectly stated that petitioner's CSF was "notable for lymphocytosis" (*i.e*. elevated lymphocytes). (ECF No. 79, p. 18 n.5 (*comparing* Ex. 27, p. 2, *with* Ex. 3, pp. 56-57).) Dr. Bakshi did not explain his interpretation of the CSF result; however, Dr. Price opines that the CSF results do not demonstrate lymphocytosis because the number of nucleated cells was not above the upper limit of normal. (Ex. A, p. 8.) Thus, Dr. Price does not agree that the CSF results are supportive of the diagnosis. (*Id*.) Dr. Tornatore did not subsequently rely on lymphocytosis/pleocytosis to conclude that petitioner suffered TM. (Ex. 35, pp. 13-14.)

*Multiple Sclerosis*, 108 J. CLINICAL INVESTIGATION 311 (2001) (Ex. 31); Agmon-Levin et al., *supra*, at Ex. 29).) However, he does not indicate what mechanism he opines would explain a post-flu vaccine TM. (*Id.*)

According to Dr. Bakshi, a causal inference can be supported when TM follows a vaccination up to 63 days later. (Ex. 27, p. 5 (citing Agmon-Levin et al., *supra*, at Ex. 29; Bakshi & Mazziotta, *supra*, at Ex. 30).) Therefore, he opines that a causal relationship between petitioner's flu vaccination and his TM occurring 54 days later is supported. (*Id.*) Moreover, he stresses that no alternative cause was identified. (*Id.*)

**b. Dr. Price's initial report (Exhibit A)**

On respondent's behalf, Dr. Price describes the basic concept of TM similarly to Dr. Bakshi. (Ex. A, p. 7.) However, he stresses that the Transverse Myelitis Consortium Working Group formulated diagnostic criteria for the syndrome back in 2002. (*Id.* (citing Agmon-Levin et al., *supra*, at Ex. A, Tab 1).) Such criteria require

> bilateral sensory, motor, or autonomic dysfunction attributable to the spinal cord, a clearly defined sensory level and peaking of symptoms within 4 hours and 21 days. In addition, evidence of an inflamed spinal cord (e.g., cerebrospinal fluid pleocytosis, elevated IgG index, or gadolinium enhancement by MRI) and exclusion of extra-axial compression etiology should be observed.

(*Id.*)

Based on Dr. Price's review, petitioner does not meet these diagnostic criteria. (Ex. A, p. 7.) Although petitioner had bilateral numbness and weakness suggestive of a spinal cord lesion and a noncompressive cervical myelopathy, there was no enhancement on the initial MRI to suggest active inflammation of the spinal cord. (*Id.*) Given that lesion enhancement is typically seen in about 74% of cases, this is atypical even as it is not exclusionary. (*Id.* (citing Pidcock et al., *supra*, at Ex. A, Tab 2).) However, the diagnostic criteria allow for the absence of enhancement on MRI only if there is other evidence of inflammation in the CSF, which petitioner's lumbar puncture did not demonstrate. (*Id.* at 7-8 (citing Ex. 3, pp. 56, 59).)[16] In this type of situation – an absence of both enhancement and normal CSF – a repeat MRI of the cervical and thoracic spine with contrast and lumbar puncture should be performed in 2-7 days. (*Id.* at 8.) And, in this case, a second MRI was performed on December 8, 2017, which also

---

[16] Specifically, Dr. Price indicates that petitioner's December 4, 2017 lumbar puncture showed "no cerebral spinal fluid pleocytosis in either tube 1 or tube 4. [He] has 2-4 nucleated cells when the upper limit of normal of nucleated cells was 5 (Ex. 3 at 57). The IgG index was not elevated. The IgG was 0.57 (normal <.85) (Ex. 3 at 60)." (Ex. A, p. 7 (note that Dr. Price cites the ECF pagination rather than the bates stamping).) He notes there are conflicting interpretations of the CSF results in the medical records. (*Id.* at 8 (*comparing* Ex. 6, p. 174 (describing lymphocytosis without reference to specific values), *with* Ex. 6, p. 110 (documenting that petitioner's lumbar puncture revealed 2-4 WBC).) He asserts the reference to lymphocytosis is not supported by the actual test result. (*Id.* (citing Ex. 3, p. 57).)

did not show enhancement. (*Id.*) Thus, Dr. Price interprets this as a complete absence of evidence of any immune-mediated or inflammatory process, a point which he suggests is consistent with the impression of petitioner's treating outpatient neurologist, Dr. Konanc. (*Id.* (citing Ex. 3, p. 46).) Dr. Price notes that this is in contrast to Dr. Bakshi's own prior case report that he had referenced in his opinion. (*Id.*) The patient in that case report, though he did not have enhancement on MRI, did have CSF pleocytosis. (*Id.* (citing Bakshi & Mazziotta, *supra*, at Ex. A, Tab 3, p. 1).)

In any event, Dr. Price does not agree that case reports of patients with TM following vaccination are informative because it should be expected to occur rarely after vaccination given baseline rate of TM and the number of people who are vaccinated. (Ex. A, p. 9.) Instead, he notes that a case-centered study of more than nine million people found no association between TM and prior immunization. (*Id.* (citing Roger Baxter et al., *Acute Demyelinating Events Following Vaccines: A Case-Centered Analysis*, 63 CLINICAL INFECTIOUS DISEASES 1456 (2016) (Ex. A, Tab 4) (*see also* Ex. E, Tab 1; Ex. H, Tab 1)).) Dr. Price acknowledges the Pidcock et al. study cited by Dr. Bakshi, but he quotes the following from that paper: "the report of an immunization being given within 30 days of onset of [Acute TM] in 28% of our cases was initially viewed as surprising. However, the large fraction of younger children affected, the current recommended vaccination schedule for children, and the lack of any single vaccine association within this group, all undermine a potential causal link between vaccination and ATM." (*Id.* (quoting Pidcock et al., *supra*, at Ex. A, Tab 2, p. 6).)

By contrast, Dr. Price opines that petitioner's clinical presentation is likely secondary to a spinal cord infarction ("SCI"). (Ex. A, p. 9.) Dr. Price agrees that petitioner's spinal lesion was longitudinally extensive (spanning at least three spinal segments from C6-T1) and stresses that SCI is a known cause of longitudinally extensive myelopathy. (*Id.*) He notes that SCI was included within the differential diagnosis cited in the radiologist's interpretation of the initial December 5, 2017 MRI. (*Id.* (citing Ex. 3, p. 85).) Moreover, petitioner had multiple vascular risk factors, including obesity, hypertension, type II diabetes, hypertriglyceridemia, hyperlipidemia, 50 pack-year tobacco use, and non-obstructive coronary artery atherosclerosis. (*Id.*) Further still, petitioner's history of two days of double vision could be concerning for a prior ischemic injury. (*Id.*) Type II diabetes, 50 pack-year tobacco use, and hyperlipidemia, are all known risk factors for spontaneous SCI while petitioner's history of paroxysmal atrial fibrillation not on anticoagulation is a risk factor for cardioembolic infarction. (*Id.* (citing Fredrik Romi & Halvor Naess, *Spinal Cord Infarction in Clinical Neurology: A Review of Characteristics and Long-Term Prognosis in Comparison to Cerebral Infarction*, 76 EURO. NEUROLOGY 95 (2016) (Ex. A, Tab 5)).) Dr. Price further explains that petitioner's clinical presentation is consistent with SCI. (*Id.*) In particular, about 30% of patients with spontaneous SCI first experienced radiating pain from between the shoulders.[17] (*Id.* at 9-10 (citing Fredrik Romi & Halvor Naess,

[17] Regarding petitioner's own presentation, Dr. Price cites petitioner's report of "tightness in his chest and upper back as well as pain in his shoulders" that occurred about eight hours prior to what he characterizes as the onset of neurologic symptoms at about 2 AM on December 4, 2017, when he then

*Characteristics of Spinal Cord Stroke in Clinical Neurology*, 66 EURO. NEUROLOGY 305 (2011) (Ex. A, Tab 6) (*see also* Ex. E, Tab 6)).) Additionally, petitioners CSF results, which showed elevated protein, but not pleocytosis or elevated IgG index, are consistent with SCI. (*Id.* at 10 (citing Jan Novy et al., *Spinal Cord Ischemia: Clinical and Imaging Patterns, Pathogenesis, and Outcomes in 27 Patients*, 63 ARCHIVES NEUROLOGY 1113 (2006) (Ex. A, Tab 7) (finding among 27 patients that 44% had increased CSF protein, but none had pleocytosis)).)

Dr. Price asserts that petitioner experienced a biphasic clinical course, with an initial worsening in the early hours of December 4 and a second worsening in the early hours of December 5 due to untreated hypotension, which is contrary to the standard of care for SCI. (Ex. A, p. 10.) He indicates that this happens with about 17% of SCI patients. (*Id*. (citing Romi & Naess, *supra*, at Ex. A, Tab 6).)

### c. Dr. Zucconi's initial report (Exhibit C)

Respondent also presented the opinion of a neuroradiologist who reviewed petitioner's clinical history as well as the MR imaging that is available in this case. (Ex. C, pp. 2-5.) Based on that review, Dr. Zucconi opines that the differential diagnosis for petitioner's condition favors SCI over TM. (*Id.* at 5.) He notes that spontaneous SCI is often misdiagnosed and, in particular, between 14-16% of patients referred for evaluation of TM are ultimately diagnosed with SCI. (*Id*. at 6 (citing Nicholas L. Zalewski et al., *Characteristics of Spontaneous Spinal Cord Infarction and Proposed Diagnostic Criteria*, 76 JAMA NEUROLOGY 56 (2019) (Ex. C, Tab 2) (*see also* Ex. E, Tab 7; Ex. F, Tab 1; Ex. H, Tab 2; Ex. 59)).)

Dr. Zucconi explains that TM refers to spinal cord inflammation involving both the left and right halves of the spinal cord. (Ex. C, p. 5.) TM results in edema (or swelling) and the inflammation within the cord can be seen on MRI with enhancement. (*Id.*) "[I]maging patterns include involvement of the entire cross-sectional diameter of the cord, affect gray and white matter on both T2 and contrast enhanced sequences involving anterior, posterior, central, [and] peripheral regions and may be asymmetric." (*Id*.) When present, TM "does not respect internal cord anatomy and has been characterized as eccentric, peripheral and nodular, as well as diffuse and heterogeneous." (*Id*. at 6 (citing Christine Goh et al., *MRI in Transverse Myelitis*, 40 J. MAGNETIC RESONANCE IMAGING 1267 (2014) (Ex. C, Tab 4) (*see also* Ex. 60)).)

In SCI, however, the primary insult to the spinal cord is infarction (i.e. deprivation of blood and/or oxygen). (Ex. C, p. 6.) In that context, the resulting edema is cytotoxic (resulting from cell death). (*Id.*) Although cytotoxic edema can be confirmed by diffusion weighted imaging, this was not done in petitioner's case. (*Id*.) Nonetheless, because the gray matter is more sensitive to blood and oxygen deprivation, on imaging the pattern of injury in SCI preferentially affects the gray matter of the cord, often presenting as a "butterfly shape" with symmetric, mirrored anterior and posterior horns

---

also experienced upper back and chest pain with bilateral lower extremity numbness and weakness. (Ex. A, p. 10 (citing Ex. 6, p. 16; Ex. 7, p. 121).)

on the right and left side of the cord. (*Id*. (citing Goh et al., *supra*, at Ex. C, Tab 4).) Moreover, the anterior aspect of the cord is most commonly affected. (*Id*.)

In petitioner's case, his MRI imaging is consistent with SCI. (Ex. C, p. 6.) It shows "preferential signal abnormalities affecting the central region and gray matter." (*Id*. (*comparing* Figures 1 & 2 of his report, *with* Zalewski et al., *supra*, at Ex. C, Tab 2 & M.J. Vargas et al., *Spinal Cord Ischemia: Practical Imaging Tips, Pearls, and Pitfalls*, 36 AM. J. NEURORADIOLOGY 825 (2015) (Ex. C, Tab 5)).) Moreover, Dr. Zucconi explains that idiopathic SCI can be related to atherosclerotic risk factors and notes that petitioner had multiple cerebrovascular risk factors. (*Id*.) Furthermore, a diagnosis of TM would require the exclusion of alternate diagnoses. (*Id*. at 5.) Thus, stressing that petitioner's imaging shows features of gray matter injury specific to SCI, he opines that SCI, rather than TM, is "a very likely diagnosis." (*Id*. at 7.)

#### d. Dr. Tornatore's initial report (Exhibit 35)

After Dr. Bakshi became unavailable to respond to Drs. Price and Zucconi, petitioner introduced an opinion by Dr. Tornatore. (Ex. 35.) Dr. Tornatore endorses and expands upon Dr. Bakshi's opinion (*Id.* at 2, 13-14, 17) and generally characterizes respondent's experts' opinions as being contrary to the treating physicians (*Id*. at 2-3). He opines that when viewing the data from the medical records in aggregate, TM is "strongly support[ed]" as petitioner's diagnosis. (*Id*. at 13-14.) He further opines that, given the immunogenic pathology of TM and the 54-day post-vaccination onset, petitioner's flu vaccine was the cause of his TM. (*Id*. at 17.) According to Dr. Tornatore, a causal inference is acceptable for a latency up to three months or more. (*Id*. (citing Bakshi & Mazziotta, *supra*, at Ex. 44; Agmon-Levin et al., *supra*, at Ex. 45).)

Dr. Tornatore describes the differing etiologies of TM and SCI similar to the above, i.e., as inflammatory and vascular respectively. (Ex. 35, p. 3.) He acknowledges that "there are noninflammatory etiologies (eg, vascular, metabolic) that may mimic the clinical and radiologic appearance of TM."[18] (*Id*. (quoting Shin C. Beh et al., *Transverse Myelitis*, 31 NEUROLOGY CLINICS 79 (2013) (Ex. 37)).) However, he posits that due to the redundancy of the blood supply to the spinal cord, atherosclerotic disease should not be considered an important etiology for SCI. (*Id*. at 4 (citing Srikanth R. Boddu et al., *Spinal Cord Infarction and Differential Diagnosis*, *in* NEUROVASCULAR IMAGING 1125 (Luca Saba & Eytan Raz eds., 2016) (Ex. 38)).) Thus, he opines that absent clinical evidence of hypotension or embolic disease at the time of neurologic presentation, an inflammatory etiology should be considered more likely. (*Id*.) Yet, hypotension itself can be associated with TM resulting from autonomic instability. (*Id*. (citing Beh et al., *supra*, at Ex. 37).) CSF results do not necessarily distinguish TM and SCI, as CSF can be normal among both groups of patients. (*Id*. at 5 (citing J. de Seze

[18] According to Dr. Tornatore, the only finding on imaging that can distinguish SCI from TM is the presence of vertebral body infarction, which is observed with SCI but not with TM. (Ex. 35, p. 5 (citing Jochen Faig et al., *Vertebral Body Infarction as a Confirmatory Sign of Spinal Cord Ischemic Stroke: Report of Three Cases and Review of the Literature*, 29 STROKE 239 (1998) (Ex. 39) (*see also* Ex. 84)).)

et al., *Idiopathic Acute Transverse Myelitis: Application of the Recent Diagnostic Criteria*, 65 NEUROLOGY 1950 (2005) (Ex. 40)).) However, although Dr. Tornatore separately urged that neither lack of MRI enhancement nor CSF findings are dispositive of a TM diagnosis, he did not specifically address Dr. Price's contention that at least one should be present according to the TM diagnostic criteria. (*Id*. at 5, 14.) Both TM and SCI can present with motor and sensory deficits as well as back pain and bowel or bladder dysfunction; however, whereas SCI will reach its nadir within hours, TM develops over the course of 12 hours to several days. (*Id.* at 4.)

In petitioner's case, he was on aspirin therapy in the months leading up to his injury, which would have prevented vascular thrombosis, he was not in atrial fibrillation as of his most recent cardiac evaluation, and his echocardiogram showed no evidence of clots in the heart. (Ex. 35, pp. 5-6 (discussing Ex. 2, pp. 40-42; Ex. 9, pp. 162-66).) Therefore, a cardio-embolic phenomena is less likely. (*Id.*) Moreover, he did not have polycythemia at his last hematology follow up, ruling out polycythemia as a risk favor for a thromboembolic event. (*Id*. at 6 (discussing Ex. 8, pp. 9-12).)

Based on his review of the medical records, Dr. Tornatore places the initial onset of petitioner's condition at about 6pm on December 3, and he suggests the symptoms continued to progress over 36 hours prior to his transfer to UNC Rex Hospital. (Ex. 35, pp. 7-9.) Moreover, he stresses that petitioner's priapism during this period was an early sign of autonomic dysfunction preceding the later onset of hypotension. (*Id*. (citing Edward R. Hammond & Douglas A. Kerr, *Priapism in Infantile Transverse Myelitis*, 66 ARCHIVES NEUROLOGY 894 (2009) (Ex. 42)).) Further to this, Dr. Tornatore notes that petitioner's hypotension was accompanied by bradycardia, whereas if it were not due to a neurogenic cause, it would instead have been associated with tachycardia. (*Id*. at 8.) Further still, Dr. Tornatore observes that petitioner's symptoms later improved with IV steroids and plasma exchange despite the ongoing presence of hypotension, which he concludes "strongly supports" an inflammatory rather than ischemic etiology for petitioner's symptoms. (*Id*. at 10-11.)

Dr. Tornatore also opines that neither petitioner's CSF results from December 4, 2017, nor his December 5, 2017 MR imaging can distinguish SCI over TM. (Ex. 35, pp. 8-9.) He stresses that the lack of enhancement does not rule out TM, noting that a significant number of TM patients do not have enhancement seen on MR imaging. (*Id*. at 14 (citing de Seze et al., *supra*, at Ex. 40; J. Sellner et al., *Diagnostic Workup of Patients with Acute Transverse Myelitis: Spectrum of Clinical Presentation, Neuroimaging and Laboratory Findings*, 47 SPINAL CORD 312 (2009) (Ex. 43) (*see also* Ex. 82)).) However, he contends that the absence of vertebral body infarction argues against SCI. (*Id*. at 9.) Moreover, had petitioner's spinal lesion been due to ischemia, one would have expected the second MRI to show a worsening of the lesion given petitioner's ongoing hypotension; however, the second MRI was unchanged. (*Id*. at 11 (citing Ex. 6, p. 213).) Additionally, the later improvement seen on petitioner's subsequent May 17, 2018 MRI also argues in favor of an inflammatory etiology, because a SCI would have resulted in atrophy and more prominent changes. (*Id*. at 12 (citing Ex. 3, pp. 19-20).) And, finally, Dr. Tornatore notes that petitioner's EMG/NCS

study, performed on December 6th, 2017, included an absence and delay of F wave responses. (*Id*. at 10 (discussing Ex. 14, pp. 8-9).) This was observed to be a non-specific abnormality; however, Dr. Tornatore opines that this has been described as a finding among TM patients. (*Id*. at 5, 10, 14 (citing Jackie A. Syme & John J. Kelly, *Absent F-Waves Early in a Case of Transverse Myelitis*, 17 MUSCLE & NERVE 462 (1994) (Ex. 41)).)

With respect to the causal relationship between flu vaccination and TM, Dr. Tornatore stresses the autoimmune post-infectious nature of TM and cites several case reports additional to what was cited by Dr. Bakshi. (Ex. 35, pp. 14-15 (citing Wafa Akkad et al., *Longitudinally Extensive Transverse Myelitis Following Vaccination with Nasal Attenuated Novel Influenza A (H1N1) Vaccine*, 67 ARCHIVES NEUROLOGY 1018 (2010) (Ex. 46) (*see also* Ex. 65); Isabelle Korn-Lubetzki et al., *H1N1 Vaccine-Related Acute Transverse Myelitis*, 13 ISR. MED. ASS'N J. 249 (2011) (Ex. 47); Naoko Nakamura et al., *Neurologic Complications Associated with Influenza Vaccination: Two Adult Cases*, 42 INTERNAL MED. 191 (2003) (Ex. 49) (*see also* Ex. 66)).) Like Dr. Bakshi, he cites molecular mimicry as the most commonly described mechanism for this autoimmunity, noting especially that it has been implicated in nerve demyelination, but remains noncommittal. (*Id*. at 16 (citing Agmon-Levin et al., *supra*, at Ex. 45; Robert S. Fujinami et al., *Molecular Mimicry, Bystander Activation, or Viral Persistence: Infections and Autoimmune Disease*, 19 CLINICAL MICROBIOLOGY REVS. 80 (2006) (Ex. 55)).) He otherwise notes that bystander activation may be the explanation as to how infectious agents induce TM via auto reactive T-cells. (*Id*. (citing Agmon-Levin et al., *supra*, at Ex. 45).) He ultimately suggests that more than one mechanism may be at work. (*Id*.) He further suggests that the "fertile field" model of autoimmunity could explain how a vaccination or other immune stimulant could act upon previously primed autoreactive T cells to initiate an autoimmune reaction leading to inflammatory demyelination even without a cross-reactive antigen. (*Id*. at 16-17 (citing Fujinami et al., *supra*, at Ex. 55; William Huynh et al., *Post-Vaccination Encephalomyelitis: Literature Review and Illustrative Case*, 15 J. CLINICAL NEUROSCIENCE 1315 (2008) (Ex. 50)).)

**e. Dr. Bajakian's initial report (Exhibit 56)**

In addition to Dr. Tornatore's opinion, petitioner also introduced an opinion by Dr. Bajakian, disagreeing with Dr. Zucconi's interpretation of petitioner's MRIs. (Ex. 56, p. 4.) Dr. Bajakian similarly describes MR imaging for SCI as predominantly affecting the gray matter; however, regarding petitioner's own scans:

> [T]he images demonstrate signal abnormality that is central and slightly anterior and lateral, but do not purely involve either the central grey matter or correspond to a single vascular territory. This does not conform to the anterior spinal artery vascular territory, nor does it confine itself to the more oxygen dependent central grey matter. This makes a spinal cord infarct a dubious diagnosis . . . Infarcts involving multiple vascular territories would necessitate emboli lodging in 3 different spinal arteries and terminating in the same area of the cord, a very unlikely scenario.

(*Id.* (internal citations omitted).) He reiterates Dr. Tornatore's suggestion that the redundancy of the vascular supply to the spinal cord renders SCI a less likely explanation for a longitudinally extensive lesion. (*Id*. (citing Goh et al., *supra*, at Ex. 60).)

Furthermore, Dr. Bajakian opines that in SCI clinical symptoms should appear abruptly – like flipping a switch – whereas petitioner's symptoms developed over 48 hours. (Ex. 56, p. 4.) Conversely, however, while symptoms are typically profound and immediate, the MR imaging of SCI usually takes several days to manifest. (*Id*. (citing Cornelis L. Alblas et al., *Acute Spinal-Cord Ischemia: Evolution of MRI Findings*, 8 J. CLINICAL NEUROLOGY 218 (2012) (Ex. 58)).) Thus, because extensive signal abnormality spanning three vertebral levels was already present upon petitioner's first MRI, this should be viewed as more consistent with TM rather than SCI. (*Id*. (citing Goh et al., *supra*, at Ex. 60).) Additionally, as Dr. Tornatore likewise observes, Dr. Bajakian finds it significant that there were no vertebral body infarcts on petitioner's scan. (*Id*. at 5 (citing Faig et al., *supra*, at Ex. 39; William T. C. Yuh et al., *MR Imaging of Spinal Cord and Vertebral Body Infarction*, 13 AM. J. NEURORADIOLOGY 145 (1992) (Ex. 61)).) Also consistent with Dr. Tornatore's opinion, Dr. Bajakian further asserts that had petitioner's lesion been the result of SCI, it is unlikely that it would have resolved on imaging by the time of petitioner's later May 17, 2018 scan. (*Id*.)

Dr. Bajakian suggests that "[a]lthough the possibility of a spinal cord infarct was considered by virtually every physician taking care of [petitioner], no MRA, CTA or conventional angiogram was ordered and performed to evaluate that possibility. This reflects the confidence that the physicians had in the diagnosis of Acute Transverse Myelitis and that a spinal cord infarct was never a primary consideration." (Ex. 56, p. 3.)

#### f. Dr. Price's first supplemental report (Exhibit E)

In response to petitioner's supplemental presentation, Dr. Price stresses that Dr. Tornatore has not adequately accounted for the complete absence of MRI enhancement, pleocytosis, and elevated IgG index. (Ex. E, pp. 1-2.) Dr. Tornatore stresses that none of these findings is present in 100% of TM patients; however, the diagnostic criteria for TM – which Dr. Tornatore himself also cited – accounts for this by requiring that only one of the three findings be present in any given case. (*Id*. at 2 (citing Sellner et al., *supra*, at Ex. 43).) Yet, petitioner had none. (*Id*.)

Additionally, he does not agree that other findings cited by Dr. Tornatore are informative. (Ex. E, pp. 2-3.) Regarding petitioner's EMG/NCS, Dr. Price notes that Dr. Tornatore cites only a single case report to support the absence of F waves as a potential feature of TM. (*Id*. (citing Syme & Kelly., *supra*, at Ex. 41).) Although Dr. Tornatore purportedly did not find any paper finding the same phenomenon with respect to SCI, Dr. Price explains that "[a]ny disease process involving injury to the anterior horn cells could potentially cause an absent f-wave response. It is unclear to me why Dr. Tornatore would believe that an absent f-wave would be specific to [TM]." (*Id*. at 3.)

Moreover, Dr. Price cites two papers that he suggests support the finding of absent f-waves in patients with SCI. (*Id*. (citing Steven H. Horowitz & Nitin Patel, *Peripheral Neurophysiology of Acute Distal Spinal Cord Infarction*, 28 PEDIATRIC NEUROLOGY 64 (2003) (Ex. E, Tab 2); Ming Lu et al., *Neurophysiological Findings in a Case of Cervical Anterior Spinal Artery Syndrome: Compound Muscle Action Potentials, A Marker for Prognosis*, 119 N.Z. MED. J. 70 (2006) (Ex. E, Tab 3)).) And, although Dr. Price agrees that vertebral body infarction does have a high specificity for SCI, he stresses that it has incredibly low sensitivity. (*Id*. at 5.) That is, one study found that only 9% of SCI patients had demonstrated vertebral body infarction. (*Id*. (citing Zalewski et al., *supra*, at Ex. E, Tab 7).)

Additionally, Dr. Price contests Dr. Tornatore's understanding of petitioner's prior vascular risk factors. (Ex. E, pp. 3-5.) "If aspirin therapy prevented any vascular thrombosis, as Dr. Tornatore implies, then patients with a first ischemic stroke treated with aspirin would never have another ischemic stroke." (*Id.* at 3.) However, in reality, the risk reduction due to antiplatelet therapy is "modest." (*Id*. (citing International Stroke Trial Collaborative Group, *The International Stroke Trial (IST): A Randomised Trial of Aspirin, Subcutaneous Heparin, Both, or Neither Among 19435 Patients with Acute Ischaemic Stroke*, 349 LANCET 1569 (1997) (Ex. E, Tab 4)).) But in any event, Dr. Price observes that given petitioner's history of atrial fibrillation and a prior transient ischemic attack, petitioner's aspirin therapy was not the standard of care for someone of his risk level and would not have eliminated his risk of cardioembolic stroke.[19] (*Id*. at 4.) Moreover, whereas Dr. Tornatore cited a single cardiac evaluation to rule out atrial fibrillation or clots in the heart, Dr. Price indicates that clinical stroke practice relies on long-term cardiac monitoring to identify occult atrial fibrillation, which is the most common etiology for cardioembolic ischemic stroke. (*Id*. at 3 (citing Dawn O. Kleindorfer et al., *2021 Guideline for the Prevention of Stroke in Patients with Stroke and Transient Ischemic Attack: A Guideline from the American Heart Association/American Stroke Association*, 52 STROKE e364 (2021) (Ex. E, Tab 5)).) Even brief episodes of atrial fibrillation are associated with an increased risk of stroke. (*Id*. at 3-4 (citing Kleindorfer et al., *supra*, at Ex. E, Tab 5).) By definition, petitioner's diagnosis of paroxysmal atrial fibrillation, i.e. episodic recurrent atrial fibrillation, would be only intermittently detected and increased his stroke risk. (*Id*. at 4.) Dr. Price finds Dr. Tornatore's assertion that atherosclerotic disease is not an important etiology for SCI to be misleading. (*Id*. at 5.) He cites a paper demonstrating that in 68% of 133 patients with SCI, atherosclerotic risk factors were identified as the suspected mechanism. (*Id*. (citing Zalewski et al., *supra*, at Ex. E, Tab 7).)

Dr. Price also does not agree that petitioner's symptoms progressed over 48 hours. (Ex. E, p. 4.) Instead, as stated in his initial report, he opines that petitioner's presentation evolved over 24-32 hours in a biphasic manner. (*Id*.) In particular, Dr. Price does not agree that there is clear evidence of further progression after petitioner

---

[19] Dr. Price asserts that "[u]sing the validated CHA(2)DS(2)-VASc risk assessment score for atrial fibrillation, [petitioner] would have an ischemic stroke risk of 7.2% per year based on his history of TIA, hypertension, diabetes, and coronary artery disease." (Ex. E, p. 4.) He explains that this represents a moderate to high risk for a cardioembolic stroke, which should be an indication for anticoagulation. (*Id.*)

became unable to stand in the emergency department at about 5 AM on December 4. (*Id*. (citing Ex. 7, p. 125).) He stresses that there is no clear evidence of further progression documented in the medical records until 1:35 AM on December 5, at which time it was noted that petitioner had a new complaint of numbness in his torso and paralysis creeping up his body. (*Id*. (citing Ex. 6, p. 635).) Dr. Price opines that it is "plausible" based on the available records that the new complaint at 1:35 AM represented a separate worsening of petitioner's condition and he reiterates that this would be consistent with SCI, wherein 17% of patients experienced a biphasic presentation with the two phases separated by 1-24 hours. (*Id*. (citing Romi & Naess, *supra*, at Ex. E, Tab 6; *see also* Zalewski et al., *supra*, at Ex. E, Tab 7 (documenting a stuttering or stepwise decline lasting for more than 12 hours in 23.3% of 133 patients with SCI)).)

Dr. Price reiterates his citation to the Baxter et al. study which found no association between vaccination and TM in a case-centered analysis of 9 million. (Ex. E, p. 2 (citing Baxter et al., *supra*, at Ex. E, Tab 1).) Further to this, he asserts that the case reports cited by Dr. Tornatore are inapposite because each of those subjects satisfied the diagnostic criteria and were therefore appropriately diagnosed with TM. (*Id*. (citing Bakshi & Mazziotta, *supra*, at Ex. 44; Akkad et al., *supra*, at Ex. 46; Korn-Lubetzki et al., *supra*, at Ex. 47).)

#### g. Dr. Zucconi's first supplemental report (Exhibit F)

Dr. Zucconi disagrees with Dr. Bajakian's suggestion that petitioner's first MRI was too soon to detect a SCI. (Ex. F, p. 1.) He observes that Dr. Bajakian's own supporting reference indicates that T2 signal hyperintensity secondary to SCI can be seen as early as 8 hours after clinical onset and was seen within 24 hours of clinical onset in all five of the examined patients. (*Id.* (citing Yuh et al., *supra*, at Ex. 61, p. 2).) In petitioner's case, his first MRI was performed 34 hours after the onset of lower extremity numbness and weakness at 2 AM on December 4, 2017. (*Id*.) He further opines that petitioner's lesion likely worsened by the time of his second MRI on December 8, 2017, which revealed better visualization of the abnormal T2 signal hyperintensity. (*Id*.) Moreover, he disagrees with Dr. Bajakian's suggestion that MRA, CTA, or catheter spinal angiography studies would have been pursued if the treating physicians had not been confident in the TM diagnosis. (*Id*. at 3 (discussing Ex. 56, p. 3).) MRA and CTA would only be indicated if there was a concern for vertebral artery dissection, which there was not. (*Id*. (citing Vikas Agarwal et al., *ACR Appropriateness Criteria Myelopathy: 2021 Update*, 18 J. AM. COLL. RADIOLOGY S73 (2021) (Ex. F, Tab 4)).)

Additionally, whereas TM imaging would typically include nondiscriminate cord edema and contrast enhancement, Dr. Zucconi reiterates that petitioner's lesion "maps perfectly to the distribution of the anterior spinal artery." (Ex. F, pp.1- 2.) He disagrees with Dr. Bajakian's assertion that the anterior cord was spared (*Id.* at 2 (citing Ex. 56, p. 2)), indicating that the anterior horns of the gray matter were involved (*Id*.). In his first report, Dr. Zucconi referenced the typical "butterfly shape," which is the pattern of gray

matter in the cord. (*Id.*) In this report, however, he further explains that signal abnormality from an infarct does not need to be so confined. (*Id*.) In petitioner's case, the signal pattern is consistent with the most common patterns in SCI, "owl eyes" and "anterior pencil-like hyperintensity." (*Id*. (citing Zalewski et al., *supra*, at Ex. F, Tab 1).)

Dr. Zucconi also disagrees with the suggestion that petitioner's lesion had demonstrated improvement on his May 17, 2018 MRI. (Ex. F, p. 2.) Instead, he opines:

> Comparative, conservative measurements of the spinal cord on both sagittal and axial T2 weighted images, at two separate levels demonstrate as much as a 29% decrease in the cross-sectional area of the cord at the level of the infarct. This tissue loss due to cell death would be expected, even after a relatively small infarct, but would be less likely after a single inflammatory/demyelinating lesion.

(*Id*.)

**h. Dr. Tornatore's first supplemental report (Exhibit 62)**

In response to Dr. Price's assertion that petitioner does not meet the diagnostic criteria for TM, Dr. Tornatore asserts that Dr. Price "incorrectly applies the strict criteria" without appreciating that the criteria at issue were created for research purposes, to create a more homogeneous group of individuals for clinical studies, rather than for purposes of clinical diagnosis. (Ex. 62, p. 2 (citing Transverse Myelitis Consortium Working Group, *Proposed Diagnostic Criteria and Nosology of Acute Transverse Myelitis*, 59 NEUROLOGY 499 (2002) (Ex. 63) [hereinafter TM Consortium]).) He suggests that petitioner's "clinical course, imaging and response to anti-inflammatory treatment all are consistent with a diagnosis of TM." (*Id.*) Further, Dr. Tornatore indicates that the authors of the diagnostic criteria discussed the example of a patient with a very similar clinical presentation to petitioner (non-enhancing lesions, normal CSF, and clinical onset not consistent with a vascular myelopathy), and the authors concluded that "labeling such a situation as 'possible ATM' maybe the best option at the moment." (*Id*. (quoting TM Consortium, *supra*, at Ex. 63, p. 3).) Moreover, Dr. Tornatore stresses that the diagnostic criteria include eliciting a history of recent vaccination or systemic illness as part of the evaluation of acute myelopathies. (*Id*. at 3-4 (citing TM Consortium, *supra*, at Ex. 63).) Thus, in addition to defending the relevance of the post-vaccinal case reports he previously cited, he asserts that "the obvious antigenic challenge of the influenza vaccination" must be balanced against the mere *potential* vascular risk factors in assessing the likely etiology of petitioner's myelopathy. (*Id.* at 3-6.)

Dr. Tornatore also disagrees with Dr. Price's assessment of the tempo of petitioner's neurologic symptoms. (Ex. 62, p. 6.) Again, he places the initial onset of symptoms as occurring as early as December 2 (report of legs giving out), becoming prominent on December 3 (report of pain in the upper back, chest, and shoulders followed by lower leg pain and numbness), and continuing to progress into December 6.

(*Id.* at 6-7 (citing Ex. 6, pp. 39, 53-59, 165-66; Ex. 7, pp. 121-26, 129).) It was only after initiation of anti-inflammatory therapy on December 6 that petitioner began to show improvement within 24 hours. (*Id*. (citing Ex. 6, pp. 125, 133, 137-38, 146, 198).) He asserts that neither of the two references Dr. Price provided on the characteristics of SCI are consistent with such a history. (*Id*. at 8 (citing Romi & Naess, *supra*, at Ex. A, Tab 6; Zalewski et al., *supra*, at Ex. C, Tab 2).) Dr. Tornatore also reiterates his view that the lack of vertebral body infarction supports a diagnosis of TM, though he does not specifically address Dr. Price's observation that such a finding has only a very low sensitivity. (*Id*. at 8.) He also stresses that both Dr. Bajakian and petitioner's treating neuroradiologist opined, contrary to Dr. Zucconi, that petitioner's cervical cord was markedly improved as of his later May 17, 2018 MRI, suggesting an inflammatory etiology. (*Id*.)

In this report, Dr. Tornatore also expands substantially on his theory of vaccine causation. (Ex. 62, pp. 8-16.) He cites a study by Markovic-Plese et al. for the proposition that influenza hemagglutinin antigen ("HA") within the flu vaccine have been shown experimentally to have T-cell cross-reactivity with central nervous system myelin proteins, including myelin oligodendrocyte glycoprotein ("MOG"), supporting a causal theory based on molecular mimicry. (*Id*. at 9 (citing Silva Markovic-Plese et al., *High Level of Cross-Reactivity in Influenza Virus Hemagglutinin-Specific CD4+ T-Cell Response: Implications for the Initiation of Autoimmune Response in Multiple Sclerosis*, 169 J. NEUROIMMUNOLOGY 31 (2005) (Ex. 68)).) After further discussing how the concepts of bystander activation and the fertile field can explain how an inflammatory response can affect the central nervous system even without antigen specificity (*Id*. at 10-13), Dr. Tornatore cites an experimental autoimmune encephalomyelitis model for multiple sclerosis as demonstrating that injection of a peptide homologous with MOG can result in demyelinating disease even in the absence of detectable levels of myelin-binding antibodies in serum. (*Id.* at 13-16 (citing Bert A. 't Hart, *Experimental Autoimmune Encephalomyelitis in the Common Marmoset: A Translationally Relevant Model for the Cause and Course of Multiple Sclerosis*, 6 PRIMATE BIOLOGY 17 (2019) (Ex. 72)).) He cites a BLAST search he conducted himself as confirmation that the hemagglutinin contained in the flu vaccine at issue has significant homology to MOG, indicating that he observed the same matching sequence as identified in the study he cited. (*Id*. at 16 (discussing Hart, *supra*, at Ex. 72).) Thus, Dr. Tornatore opines that "it [is] reasonable to conclude that the influenza vaccine can play a significant causal role in initiating transverse myelitis." (*Id*.)

#### i. Dr. Bajakian's first supplemental report (Exhibit 73)

In his final report, Dr. Bajakian observes that the cardiovascular risk factors identified by respondent are "not equivalent to causal factors." (Ex. 73, p. 1.) In particular, he stresses that SCIs are typically embolic rather than atherosclerotic, and notes that no embolic source was discovered as part of petitioner's evaluation. (*Id*.) Turning to the diagnostic criteria for SCI, Dr. Bajakian asserts that SCI can be ruled out in petitioner's case because (1) onset to nadir of petitioner's condition did not occur in 12 hours or less; (2) his MRI was not supportive of SCI because (a) signal abnormality

included the posterior columns and (b) he did not have diffusion weighted imaging and his MRI did not otherwise show either vertebral body infarction or arterial dissection/occlusion adjacent to the lesion; and (3) an alternative diagnosis is more likely. (*Id*. at 3 (citing Zalewski et al., *supra*, at Ex. 59).) Ultimately, just as respondent argues there are no confirmatory findings to support TM, Dr. Bajakian observes that there are likewise no confirmatory findings that would support SCI. (*Id*. at 12.)

Dr. Bajakian explains that a SCI typically matches a specific arterial territory, most commonly the anterior spinal artery. (Ex. 73, p. 4 (citing B. Guerrero et al., *A Comparison of Clinical Presentation and MRI Findings in Neuromyelitis Optica Spectrum Disorder and Spinal Cord Infarct in Complex Patients with Multiple Co-Morbidities*, 6. J. NEUROLOGY & STROKE 11 (2017) (Ex. 78); Novy et al., *supra*, at Ex. A, Tab 7); Nuttawan Vongveeranonchai et al., *Evaluation of a Patient with Spinal Cord Infarction After a Hypotensive Episode*, 45 STROKE e203 (2014) (Ex. 79)).) The anterior spinal artery supplies blood to the anterior two-thirds of the spinal cord, including the lateral columns and central gray matter. (*Id.*) Therefore, Dr. Bajakian contends that with anterior spinal cord infarct, which is the diagnosis Dr. Zucconi proposes in this case, the lesion must be limited to the anterior two-thirds of the spinal cord. (*Id.*) However, Dr. Bajakian argues that a diagnosis of anterior spinal cord infarct is precluded in this case because petitioner's MR imaging demonstrates that the lesion extends beyond the anterior two-thirds of the spinal cord into the posterior columns, which receive blood from the posterolateral spinal arteries, not the anterior spinal artery. (*Id.* at 4-5 (citing Halvor Naess & Fredrik Romi, *Comparing Patients with Spinal Cord Infarction and Cerebral Infarction: Clinical Characteristics, and Short-Term Outcome*, 7 VASCULAR HEALTH & RISK MGMT. 497 (2011) (Ex. 74); Stefan Weidauer et al., *Magnetic Resonance Imaging and Clinical Features in Acute and Subacute Myelopathies*, 27 CLINICAL NEURORADIOLOGY 417 (2017) (Ex. 75); H. Louis Harkey et al., *A Clinician's View of Spinal Cord Injury*, 271B ANATOMICAL REC. 41 (2003) (Ex. 80)).) Given that the lesion in TM can span the entire width of the spinal cord (*Id.* at 5, 7 (citing Weidauer et al., *supra*, at Ex. 75; Michael J. Lee et al., *Diagnostic Approach to Intrinsic Abnormality of Spinal Cord Signal Intensity*, 39 RADIOGRAPHICS 1824 (2019); Goh et al., *supra*, at Ex. 60)), the suggestion that petitioner experienced an infarct in multiple vascular territories (anterior and posterolateral vascular territories) is a far less likely scenario (*Id.* at 4-7).

Moreover, Dr. Bajakian contends that the longitudinally extensive nature of petitioner's spinal cord abnormality is most consistent with a diagnosis of TM. (Ex. 73, pp. 7-8 (citing Weidauer et al., *supra*, at Ex. 60; Dougho Park et al., *Spinal Cord Infarction: A Single Center Experience and the Usefulness of Evoked Potential as an Early Diagnostic Tool*, 11 FRONTIERS NEUROLOGY, 2020, at 1 (Ex. 83)).) In a study comparing the clinical and imaging characteristics of SCI with TM, the authors determined that the lesion length in TM was significantly longer than in SCI, with three levels implicated versus two levels respectively. (*Id.* at 8 (citing Park et al., *supra*, at Ex. 83).) Furthermore, the authors concluded that SCI is typically distributed across the lower thoracic, cervical, and conus levels, whereas TM is mainly distributed across the cervical and upper thoracic levels. (*Id.* (citing Park et al., *supra*, at Ex. 83).) In this

case, petitioner's spinal cord abnormality spanned the C5/C6 level through the T1/T2 level, which Dr. Bajakian opines is more consistent with TM. (*Id.* at 7-8.)

Dr. Bajakian further asserts that the specific signal patterns described by Dr. Zucconi (owl's eyes and anterior pencil like hyperintensity), though at one time thought to be indicative of occlusion of the anterior spinal arteries, has since been found not to be specific to SCI. (Ex. 73, p. 8.) Instead, it has been reported in a number of conditions, including TM. (*Id*. (citing Joy Zhuo Ding & Hugh J. McMillan, *"Owl's Eye" Sign in Acute Flaccid Paralysis*, 46 CANADIAN J. NEUROLOGICAL SCIS. 756 (2019) (Ex. 85); Mansoor C. Abdulla, *Myelin Oligodendrocytes Glycoprotein Antibody-Positive Longitudinally Extensive Myelitis with Owl's Eye Sign Mimicking Acute Anterior Spinal Artery Ischemia*, 25 ANNALS INDIAN ACAD. NEUROLOGY 931 (2022) (Ex. 86); E. Bulut et al., *MRI Predictors of Recurrence and Outcome After Acute Transverse Myelitis of Unidentified Etiology*, 40 AM. J. NEURORADIOLOGY 1427 (2019) (Ex. 87)).)

Regarding petitioner's later May 17, 2018 MRI, Dr. Bajakian contests Dr. Zucconi's interpretation of this study as failing to show improvement. (Ex. 73, p. 9.) He interprets petitioner's MRI performed on May 17, 2018 as demonstrating a "striking" and "substantial" decrease in the prior signal abnormality, and notes that these findings mirror petitioner's observed clinical improvement. (*Id.* at 9-11.) Moreover, Dr. Bajakian stresses that the treating neuroradiologist interpreted the scan as showing improvement. (*Id*. (citing Ex. 17, pp. 4-5).) He explains that "residual atrophy within the cord can occur in TM, and will explain [petitioner's] incomplete recovery. However, the presence of residual atrophy does not devalue the substantial improvement in the signal abnormality appreciated in the December 2017 imaging. Such improvement [is] not seen in SCI." (*Id*.)

#### j. Dr. Price's second supplemental report (Exhibit H)

Regarding Dr. Bajakian's assertion that no embolic source for petitioner's injury was discovered, Dr. Price counters:

> [Petitioner] carried a diagnosis of paroxysmal atrial fibrillation, for which he was not on anticoagulation. From a clinical neurovascular perspective, this would be considered the embolic source in any patient with an embolic appearing stroke. In this context, it is an incorrect statement by Dr. Bajakian that an embolic source was not identified. There is no clinical requirement or expectation to identify a residual clot . . . .

(Ex. H, p. 1.) Moreover, he continues to maintain that atherosclerotic risk factors are significant to SCI. (*Id*. at 2 (citing Zalewski et al., *supra*, at Ex. H, Tab 2).) Unsurprisingly, Dr. Price disagrees with Dr. Bajakian's application of the diagnostic criteria for SCI, largely due to the factual disagreements discussed in the prior reports. (*Id*.)

Dr. Price agrees that risk factors are not equivalent to causal factors, but he asserts that it would be ridiculous to seek to mathematically compare the rarity of SCI to the rarity of post-vaccinal TM given the lack of epidemiologic support for the existence of post-vaccinal TM. (Ex. H, p. 3.) Dr. Price also continues to disagree with Dr. Tornatore's articulation of his theory of causation as stated in his prior report at Exhibit 35; however, Dr. Price does not discuss Dr. Tornatore's subsequent report at Exhibit 62 and does not confirm that he had even reviewed it. (*Id*. at 1, 3-4.)

**k. Dr. Tornatore's second supplemental report (Exhibit 89)**

In his final report, Dr. Tornatore stresses that it is generally accepted in the medical community that TM can present as an autoimmune phenomenon occurring either post-infection or post-vaccination.[20] (Ex. 89, pp. 1-2.) Further to that, he notes the case reports filed with prior reports and he contends that such case reports of post-flu vaccine TM should be considered important to understanding the mechanism of vaccine-mediated injury. (*Id*. at 2 (citing INST. OF MED., *Approach: Weight of Evidence – Mechanistic Evidence*, *in* ADVERSE EFFECTS OF VACCINES: EVIDENCE AND CAUSALITY 45-47 (Kathleen Stratton eds., 2012) (Ex. 90) [hereinafter 2012 IOM Report]).) In particular, he suggests that the Akkad et al. and Nakamura et al. case reports offer strong mechanistic evidence. (*Id*. at 2-3 (citing Akkad et al., *supra*, at Ex. 65; Nakamura et al., *supra*, at Ex. 66).) For example, one of the subjects described by Nakamura et al. developed myeloneuropathy following flu vaccination and had anti-GM1 antibodies detected, which the authors attributed to the antecedent vaccination. (*Id*. (citing Nakamura et al., *supra*, at Ex. 66).) Dr. Tornatore asserts that the significance of this finding is further buttressed by a number of animal studies that implicate the flu vaccine as a cause of myelitis and neuritis and reiterates his reliance on the Markovic-Plese study. (*Id*. at 3-8 (citing Irving Nachamkin et al., *Anti-Ganglioside Antibody Induction by Swine (A/NJ/1976/H1N1) and Other Influenza Vaccines: Insights into Vaccine-Associated Guillain-Barré Syndrome*, 198 J. INFECTIOUS DISEASES 226 (2008) (Ex. 91); Claudio Procaccini et al., *Animal Models of Multiple Sclerosis*, 759 EURO. J. PHARMACOLOGY 182 (2015) (Ex. 92); Donald W. Ziegler et al., *Experimental Allergic Neuritis-Like Disease in Rabbits After Injection with Influenza Vaccines Mixed with Gangliosides and Adjuvants*, 42 INFECTION & IMMUNITY 824 (1983) (Ex. 93)).) He concludes: "In summary, there are case reports, animal studies and homology data that support the thesis that components of an influenza vaccine could trigger TM via molecular mimicry. This extends my previous discussion of homology between MOG and influenza HA as potential cross-reactive epitopes." (*Id*. at 9.)

[20] To support this proposition, Dr. Tornatore cited to a fact sheet regarding TM on the National Institute of Neurological Disorders and Stroke ("NINDS") website, including a screenshot of a portion of the informational page within his report. (Ex. 89, pp. 1-2.) Petitioner did not file a copy of the fact sheet as an exhibit in this case; however, Dr. Tornatore did include a hyperlink for the informational page within the references section of his report. (*Id.* at 10.) The hyperlink leads to: *Transverse Myelitis*, NAT'L INST. NEUROLOGICAL DISORDERS & STROKE, https://www.ninds.nih.gov/health-information/disorders/transverse-myelitis (last reviewed Mar. 13, 2026). Use of hyperlinks is discouraged. All supporting materials should be filed as exhibits.

## V. Analysis

### a. Diagnosis

The Vaccine Act requires a petitioner to present a claim for compensation for a "vaccine-related injury or death," as well as preponderant evidence supporting his claim. § 300aa-11(c); § 300aa-13(a)(1)(A); *Stillwell v. Sec'y of Health & Human Servs.*, 118 Fed. Cl. 47, 56 (2014), *aff'd*, 607 F. App'x 997 (Fed. Cir. 2015). Accordingly, a petitioner must specify his "vaccine-related injury and shoulder the burden of proof on causation." *Broekelschen*, 618 F.3d at 1346. Thus, where the identity and nature of the vaccine-related injury is in dispute, the Federal Circuit has concluded that it is "appropriate for the special master to first determine what injury, if any, [is] supported by the evidence presented in the record before applying the *Althen* test to determine causation." *Lombardi*, 656 F.3d at 1352-53. However, "the function of a special master is not to 'diagnose' vaccine-related injuries." *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1382 (Fed. Cir. 2009). Instead, the special master must determine, "based on the record evidence as a whole and the totality of the case, whether it has been shown by a preponderance of the evidence that a vaccine caused the [petitioner's] injury." *Id.* (quoting *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 549 (Fed. Cir. 1994)).

In this case, the parties have extensively briefed the question of petitioner's diagnosis (ECF No. 77, pp. 59-86; ECF No. 79, pp. 15-31; ECF No. 81, pp. 2-16) and petitioner has specifically premised his discussion of causation-in-fact on his diagnosis of TM (ECF No. 77, pp. 87-110), which is disputed (ECF No. 79, p. 31 (contending that "[t]he evidence in this case does not preponderantly support a TM diagnosis")). Accordingly, it is appropriate to determine as a threshold matter whether petitioner has preponderantly demonstrated that he suffered TM before turning to the question of whether his injury can be causally related to his preceding flu vaccination. *Accord Broekelschen*, 618 F.3d at 1346 (concluding it was appropriate for the special master to first resolve whether the evidence best supported a diagnosis of transverse myelitis, as petitioner argued, or anterior spinal artery syndrome, as respondent argued, before reaching the *Althen* test). Based on my review of the extensive expert opinions presented by both parties, and having considered the parties' arguments in their briefing, I ultimately find that this battle of the experts effectively results in a draw.[21] Thus, I see no basis for disturbing the diagnosis of the treating physicians.

---

[21] Although not addressed in detail, I have accounted for the relative experience and qualifications of the competing experts (*see* n. 3-7, *supra*). *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1325-26 (Fed. Cir. 2010) ("Assessments as to the reliability of expert testimony often turn on credibility determinations . . . ."); *see also Porter v. Sec'y of Health & Human Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("[T]his court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act.").

Although Dr. Bajakian correctly observes that risk factors are not equivalent to causal factors (Ex. 73, p. 2), I am not persuaded by petitioner's experts' attempts to downplay the significance of his cardiovascular risk factors for stroke. Nonetheless, respondent's experts have not effectively rebutted Dr. Bajakian's assertion that petitioner's lesion extends beyond the anterior spinal cord, which would be more likely to favor a diagnosis of TM. (Ex. 56, pp. 3-4; Ex. 73, p. 2.) Otherwise, while the experts disagree as to the specific pattern of petitioner's lesion (*compare* Ex. 56, pp. 3-4 & Ex. 73, p. 2, *with* Ex. C, p. 6 & Ex. F, p. 2), the treating neuroradiologist included both TM and SCI in petitioner's differential diagnosis (Ex. 6, p. 215) and Drs. Tornatore, Bajakian, and Zucconi all seem to have accepted that MR imaging can fail to distinguish SCI and TM (Ex. 35, p. 5; Ex. 56, p. 5; Ex. C, p. 5). Accordingly, I am not persuaded that either party has demonstrated the pattern of petitioner's lesion to be decisive.

And, while Dr. Tornatore was effectively forced to concede that the complete absence of MRI enhancement, pleocytosis, and elevated IgG index leaves a diagnosis of TM merely "possible" (Ex. 62, p. 2 (quoting TM Consortium, *supra*, at Ex. 63, p. 3); *see also* Ex. 35, p. 14), Dr. Price conversely could state only that the biphasic symptom presentation he felt permitted a diagnosis of SCI was "plausible" based on the medical records (Ex. E, p. 4). On that point, Dr. Price relies only on a gap in relevant notations within the medical treatment records, which he argues suggests a temporary stabilization of petitioner's neurologic condition. (Ex. A, p. 10; Ex. E, p. 4; Ex. H, p. 2.) Specifically, Dr. Price appears to contend that petitioner's symptoms stabilized around 5 AM on December 4, prior to his transfer to UNC Rex Hospital, before further progressing at around 1:35 AM on December 5. (Ex. E, p. 4.) However, Dr. Price's characterization of petitioner's presentation is unpersuasive and inconsistent with the medical records.

Petitioner's treating providers continuously characterized the onset of petitioner's neurological symptoms as progressive. (*E.g.*, Ex. 6, p. 15, 27, 125, 165.) His providers repeatedly documented that petitioner's symptoms began on December 3 with chest tightness and thoracic spasms followed by the onset of bladder retention and lower extremity weakness that worsened to the point where he needed support while walking, which led to his presentation in the ED on December 4. (Ex. 6, pp. 16, 54; Ex. 7, p. 129.) While in the ED, petitioner's weakness progressed to the point where he was no longer able to stand, and he also complained of a new onset of upper extremity weakness. (Ex. 7, p. 125.) There is no documentation within the medical records that suggests petitioner's treating providers felt petitioner's condition had ever stabilized by the time of transfer. To the contrary, the continued progression of petitioner's condition prompted his transfer to UNC Rex Hospital, and, upon transfer the admitting provider explicitly assessed petitioner with progressive weakness. (Ex. 7, pp. 125-26; Ex. 6, p. 15.) Petitioner's treating providers continued to document petitioner's neurologic condition as progressively worsening on December 5 until he his transfer to the ICU on December 6, at which point petitioner had no sensation below the upper chest. (*Id.* at 45-47, 165-66.) Accordingly, viewing the medical records as a whole favors a finding that petitioner's neurologic symptoms continued to progress from onset on the evening of December 3 through December 6. Absent a biphasic symptom presentation, the

progression of petitioner's symptoms appears to be more consistent with TM based on the experts' discussion of the nadir of petitioner's condition.

Ultimately, this diagnostic dilemma is well illustrated by the fact that while the diagnostic process for TM seeks to rule out other non-inflammatory causes of myelopathy (TM Consortium, *supra*, at Ex. 63, p. 5), the diagnostic criteria for SCI likewise requires a determination that no other diagnosis is more likely (Zalewski et al., *supra*, at Ex. 59, p. 5)). Moreover, as Dr. Bajakian observed, both of the proposed diagnoses lack significant objective confirmatory data. (Ex. 73, p. 12.) And, as Dr. Tornatore had noted, this difficulty is acknowledged within the discussion contained in the TM Consortium Working Group's published diagnostic criteria. Under "Limitations of the proposed criteria," the authors explain:

> There may be cases that fulfill all of the proposed criteria with the exception of objective documentation of inflammation within the spinal cord. Thus, a situation in which spinal MRI shows an appropriately located high signal intensity lesion on T2-weighted sequences but no clear-cut enhancement of the abnormality following gadolinium administration could be envisioned. If the CSF were normal, then a diagnosis of ATM would not be possible under the proposed criteria. Further, the clinical findings present in such an individual may not be consistent with a vascular myelopathy either. Nevertheless, labeling such a situation as "possible ATM" may be the best option at the moment.

(TM Consortium, *supra*, at Ex. 63, p. 3.)

To be sure, respondent and his experts raise a number of significant reasons to be doubtful of the TM diagnosis, and this remains a very close call. However, by his own recitation of the factual history, respondent acknowledges that petitioner was assessed by his treating physicians as suffering TM even after review of his MRI and CSF results. (ECF No. 79, p. 7 (citing Ex. 6, p. 125 as including an assessment of "progressive ascending weakness secondary to transverse myelitis").) By contrast, respondent has not cited to any instance in which any of petitioner's treating physicians clearly diagnosed SCI despite it also being within the radiologist's differential diagnosis and despite being aware of his pre-existing cardiovascular risk factors. At best, Dr. Price suggested that petitioner's treating outpatient neurologist's, Dr. Konanc's, recitation of petitioner's history – noting "[t]he patient has numerous cerebrovascular risk factors but did not have evidence of immune action during the time that he experienced his episode of myelitis" (Ex. 3, p. 46) – is consistent with his own understanding. (Ex. A, p. 8.) However, Dr. Konanc nonetheless characterized petitioner's initial work up as "suggestive of transverse myelitis" and, moreover, maintained the assessment of traverse myelitis following his own outpatient evaluation of petitioner. (Ex. 3, pp. 46, 48-49.) Moreover, even if respondent were correct that the TM diagnosis was never "definitively" stated by the treaters (ECF No. 79, p. 15), the experts agree that the treaters did embark on a course of treatment consistent with a diagnosis of TM (IV Solu Medrol and plasmapheresis) that did result in subjective and

objective improvement while Dr. Price also observed that they did not immediately seek to treat his hypotension, which would have been the standard of care for SCI (Ex. A, p. 10).

As respondent has stressed, petitioner does bear the burden of proof with respect to establishing his diagnosis. (ECF No. 79, p. 31 (citing *Lombardi*, 656 F.3d at 1352; *Broekelschen*, 618 F.3d at 1349).) Importantly, however, special masters are meant to weigh the available evidence, not diagnose the petitioner. *Andreu*, 569 F.3d 1 at 1382. And in that regard, having considered the expert presentations, which present this as an exceedingly close question, the treating physicians' impression and the resulting course of treatment are otherwise clear and, though not binding, treating physician opinions as to diagnosis are entitled to significant weight. § 300aa-13(b)(1)(A) (the special master "shall consider . . . any diagnosis . . . which is contained in the record"). *See also, e.g.*, *D'Angiollini v. Sec'y of Health & Human Servs*., No. 99-578V, 2014 WL 1678145, at *24 (Fed. Cl. Spec. Mstr. Mar. 27, 2014) (finding a treating physician's opinion regarding diagnosis "worth a great deal" and "almost definitive evidence on that point" while placing less weight on that physician's opinion regarding etiology), *mot. for rev. denied*, 122 Fed. Cl. 86 (2015), *aff'd per curiam*, 645 F. App'x 1002 (Fed. Cir. 2016).

Accordingly, the evidence preponderates in favor of a finding that petitioner suffered TM, even if just barely.

### b. *Althen* test

#### i. *Althen* prong one

Under *Althen* prong one, petitioner must provide a "reputable medical theory," showing that the subject vaccine can cause the type of injury alleged. *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355-56 (Fed. Cir. 2006) (quoting *Pafford v. Sec'y of Health & Human Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004), *mot. for rev. denied*, 64 Fed. Cl. 19 (2005), *aff'd*, 451 F.3d 1352 (Fed. Cir. 2006)). Such a theory need only be "legally probable, not medically or scientifically certain." *Knudsen*, 35 F.3d at 548-49. Petitioner may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *See Andreu*, 569 F.3d at 1378-79 (citing *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1325-26 (Fed. Cir. 2006)). However, "[a] petitioner must provide a 'reputable medical or scientific explanation' for [the proposed causal] theory. While it does not require medical or scientific certainty, it must still be 'sound and reliable.'" *Boatmon v. Sec'y of Health & Human Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019) (citation omitted) (first quoting *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 (Fed. Cir. 2010); then quoting *Knudsen*, 35 F.3d at 548-49). That is, although petitioners are not required to prove their theories in any one way, they must in all events support their proffered theory with sound and reliable scientific explanation, *Boatmon*, 941 F.3d at 1359, and provide evidence that establishes on balance that the vaccine at issue can

more likely than not cause the injury at issue, *Cerrone v. Sec'y of Health & Human Servs.*, 146 F.4th 1113, 1120-23 (Fed. Cir. 2025).

In this case, petitioner argues that it is appropriate to take a holistic view of the medical literature pertaining to the entire family of central nervous system demyelinating injuries, including TM, multiple sclerosis, acute disseminated encephalomyelitis ("ADEM"), optic neuritis ("ON"), neuromyelitis optica ("NMO"), and myelin oligodendrocyte glycoprotein antibody-associated disease ("MOGAD"). (ECF No. 77, pp. 87-88.) In that regard, petitioner contends that it is well established that TM can be an autoimmune condition that can have either a post-infectious or post-vaccinal etiology. (*Id*. at 88.) Petitioner discusses several potential mechanisms of autoimmunity, but he appears to focus primarily on molecular mimicry. (*Id.* at 88-96.)

Molecular mimicry is "a generally accepted scientific principle," but "mere invocation of the scientific term does not carry a petitioner's burden in a Program case." *Deshler v. Sec'y of Health & Human Servs*., No. 16-1070V, 2020 WL 4593162, at *20 (Fed. Cl. Spec. Mstr. July 1, 2020) (citing *Forrest v. Sec'y of Health & Human Servs.*, No. 14-1046V, 2019 WL 925495, at *3 (Fed. Cl. Spec. Mstr. Jan. 28, 2019)). Afterall, a "special master is entitled to require some indicia of reliability to support the assertion of the expert witness." *Moberly*, 592 F.3d at 1324. Petitioner is not obligated to provide a detailed biologic mechanism to meet his burden of proof. *Kottenstette v. Sec'y of Health & Human Servs*., 861 F. App'x 433, 440-41 (Fed. Cir. 2021) (citing *Knudsen*, 35 F.3d at 549; *Simanski v. Sec'y of Health & Human Servs.*, 671 F.3d 1368, 1384 (Fed. Cir. 2012)). However, the Court of Federal Claims has previously explained that while the *Althen* Court rejected the need for scientific certainty, "in 'a field bereft of complete and direct proof of how vaccines affect the human body,' . . . [t]he standard of proof does not operate as a sliding scale that varies depending upon the quantity and quality of the scientific evidence that is available." *Caves v. Sec'y of Health & Human Servs*., 100 Fed. Cl. 119, 143 (2011) (quoting *Althen*, 418 F.3d at 1280), *aff'd*, 463 F. App'x 932 (Fed. Cir. 2012). Thus, as respondent notes in his motion response (ECF No. 79, p. 33), special masters have previously stressed that "[t]he line must be drawn somewhere between speculation and certainty." *Brayboy v. Sec'y of Health & Human Servs.*, No. 15-183V, 2021 WL 4453146, at *19 (Fed. Cl. Spec. Mstr. Aug. 30, 2021).

Here, petitioner asserts that the study by Olson et al. provides direct experimental evidence that virus-specific T cells can induce central nervous system demyelination. (ECF No. 77, pp. 92-93 (discussing Olson et al., *supra*, at Ex. 31).) Further to this, petitioner argues that two additional studies, by Jahnke et al. and Wucherpfennig & Strominger, respectively, demonstrate that there is sequence homology between influenza A and myelin basic protein. (*Id*. at 93 (discussing Ulrike Jahnke et al., *Sequence Homology Between Certain Viral Proteins and Proteins Related to Encephalomyelitis and Neuritis*, 229 SCIENCE 282 (1985) (Ex. 94); Kai W. Wucherpfennig & Jack L. Strominger, *Molecular Mimicry in T Cell-Mediated Autoimmunity: Viral Peptides Activate Human T Cell Clones Specific for Myelin Basic Protein*, 80 CELL 695 (1995) (Ex. 95)).) Additionally, petitioner argues that a study by Markovic-Plese et al. demonstrates that the hemagglutinin of the influenza A virus can

cross-react with multiple different central nervous system antigens, including multiple myelin-derived peptides. (*Id*. at 93-95 (discussing Markovic-Plese et al., *supra*, at Ex. 68).) Finally, petitioner notes that Dr. Tornatore has cited a marmoset EAE model study of MS to demonstrate that the proposed molecular mimicry can occur at the T-cell level without any demonstration of detectable antibodies. (*Id.* at 95-96 (discussing ’t Hart, *supra*, at Ex. 72).) In addition to noting that several case reports have been filed that can help to demonstrate this can occur in human patients, petitioner stresses that both the TM Consortium Working Group and the National Institute of Neurologic Disorders and Stroke (NINDS) accept that TM can occur, albeit rarely, post-vaccination. (*Id*. at 97.) Specifically, the TM Consortium Working Group advises treating physicians to screen patients regarding both any recent history of systemic illness as well as vaccination (TM Consortium, *supra*, at Ex. 63, p. 5),and NINDS lists “post-infectious or post-vaccine autoimmune phenomenon” among a list of conditions that appear to cause TM (Ex. 89, p. 1; *see also* n. 20, *supra*).

Respondent argues, however, that Dr. Tornatore has not substantiated his reliance on molecular mimicry. (ECF No. 79, pp. 33-35.) In particular, he argues that petitioner has not offered “a specific mimic or homology relevant to the flu vaccine petitioner actually received and TM.” (*Id*. at 33.) Instead, he dismisses petitioner’s evidentiary showing as merely speculating that several mimics could be implicated. (*Id*.) And, stressing that sequence homology alone is insufficient to preponderantly demonstrate molecular mimicry, respondent contends that “Dr. Tornatore has offered no evidence to suggest that the flu vaccine components are in any way linked to the development of TM.” (*Id*. at 33-34.) In that regard, he argues that Dr. Tornatore’s reliance on animal models involving either EAN or MS as well as studies involving ADEM and MOGAD are not on point. (*Id*. at 34-35.) Stressing the absence of any direct study supporting a causal relationship between the flu vaccine and TM, respondent contends that petitioner’s showing relies heavily on case reports, a weak form of evidence, and that the specific case reports offered are distinguishable. (*Id*. at 35-37.) Respondent urges that his experts’ competing view, which is informed by the large-scale epidemiologic study by Baxter et al. should be credited instead. (*Id*. at 37 (discussing Baxter et al., *supra*, at Ex. A, Tab 4).) Respondent acknowledges that the Baxter et al. study is not dispositive but suggests that it supports respondent’s view that a causal relationship is not present given the lack of evidence to the contrary. (*Id*.)

Molecular mimicry has been acknowledged as a sound and reliable theory in the Vaccine Program for vaccine-related central nervous system demyelinating diseases, including TM, following various vaccines, including the flu vaccine. *See, e.g.*, *Hubbard v. Sec’y of Health & Human Servs*., No. 23-917V, 2026 WL 693446, at *19-21 (Fed. Cl. Spec. Mstr. Feb. 11, 2026) (accepting molecular mimicry as a theory to explain how the flu vaccine can cause TM); *Songero v. Sec’y of Health & Human Servs*., No. 18-300V, 2025 WL 3013090, at *15-18 (Fed. Cl. Spec. Mstr. Oct. 3, 2025) (accepting Dr. Tornatore’s opinion that the flu vaccine can cause TM via molecular mimicry); *Reinhardt v. Sec'y of Health & Human Servs*., No. 17-1257V, 2021 WL 1851491, at *16 (Fed. Cl. Spec. Mstr. Apr. 2, 2021) (noting “that the Vaccine Program generally recognizes that the flu vaccine is capable of causing a demyelinating condition”); *Palattao v. Sec'y of*

*Health & Human Servs.*, No. 13-591V, 2019 WL 989380, at *35-37 (Fed. Cl. Spec. Mstr. Feb. 4, 2019) (explaining "many of the existing Program decisions in which TM has been found to be caused by a vaccine rely on a mechanism [of] [ ]molecular mimicry"); *J.S. v. Sec'y of Health & Human Servs*., No. 14-851V, 2018 WL 11731139, at *13 (Fed. Cl. Spec. Mstr. Apr. 9, 2018) ("In the Program, petitioners have successfully established that a number of different vaccines (including the flu vaccine) were causally connected to their subsequent development of TM."). In this case, although I agree with respondent that Dr. Tornatore's opinion does appear somewhat scattershot in that he proposed multiple different mimics (ECF No. 79, p. 33), respondent nonetheless is unpersuasive in seeking to entirely discount the basis Dr. Tornatore has presented for his opinion that components of the flu vaccine can cross-react with central nervous system myelin. In particular, while respondent's experts opined at a broader level that a causal relationship is not supported epidemiologically (*e.g.*, Ex. H, p. 3), they did not meaningfully counter the details of the mechanisms discussed by Dr. Tornatore. Nor did they specifically discuss the studies respondent now criticizes for the first time in his motion response. Indeed, as noted above, Dr. Price never addressed either of Dr. Tornatore's two supplemental reports, which contained the bulk of his discussion of molecular mimicry. Absent any competing expert opinion, I do not agree that the studies cited by Dr. Tornatore can be categorically dismissed as being irrelevant. (*See, e.g.*, TM Consortium, *supra*, at Ex. 63, p. 3 (explaining that "the inflammatory pathologies of MS, ADEM, and NMO may exist on a continuum with ATM").)

Accordingly, in light of the above, and considering the record as a whole, petitioner has met his preponderant burden of proof under *Althen* prong one.

ii. *Althen* prong three

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1278. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* at 1281. A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *de Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must also coincide with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id*.; *Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 542 (2011), *mot. for recons. denied after remand*, 105 Fed. Cl. 353 (2012), *aff'd per curiam*, 503 F. App'x 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Human Servs.*, No. 11-355V, 2013 WL 3214877, at *26 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. denied sub nom.*, *C.K. v. Sec'y of Health & Human Servs.*, 113 Fed. Cl. 757 (2013), *aff'd sub nom.*, *Koehn v. Sec'y of Health & Human Servs.*, 773 F.3d 1239 (Fed. Cir. 2014).

Petitioner argues that the onset of his TM occurred at about eight weeks (or 53 to 54 days) post-vaccination. (ECF No. 77, pp. 105-06.) He stresses that both Dr. Bakshi and Dr. Tornatore opined that this constitutes a medically appropriate timeframe for a

causal inference (*Id.* at 106 (citing Ex. 27, p. 5; Ex. 35, p. 17), and further notes that the available medical literature supports a period from between several days to 3 months as the medically appropriate timeframe for a post-vaccinal TM to arise (*Id.* (citing Agmon-Levin et al., *supra*, at Ex. 29, p. 1)). In his response, respondent argues only that petitioner's failure to satisfy his burden of proof under *Althen* prong one likewise prevents him from meeting his burden under *Althen* prong three. (ECF No. 79, p. 40.) "Without a reliable medical theory of causation from which this Court can accept a medically acceptable timeframe for the onset [of] petitioner's condition, petitioner has not presented evidence of a medically acceptable temporal relationship between the flu vaccination and the onset of his condition." (*Id.*) Respondent did not argue in favor of any other understanding of the timing of onset of petitioner's own condition.

Some prior decisions have suggested that the appropriate temporal relationship for a post-vaccinal central nervous system demyelinating injury extends out to only 4-6 weeks (*i.e*. 42 days) post-vaccination. *E.g.*, *Dewit v. Sec'y of Health & Human Servs*., No. 18-1353V, 2026 WL 822767, at *29-33 (Fed. Cl. Spec. Mstr. Feb. 25, 2026) (finding that a 71-day onset does not support causal inference for the flu vaccine to have caused TM given that the accepted onset period is 4-6 weeks post-vaccination). However, in some other cases, latencies as long as or longer than present in this case have been accepted. *See, e.g.*, *Songero*, 2025 WL 3013090, at *18-19 (finding onset of TM 63 days after vaccine was reasonable based on medical literature indicating that the onset of TM may, "on rare occasion," be up to 65 days post-vaccination); *Mullins v. Sec'y of Health & Human Servs*., No. 19-320V, 2024 WL 4045424, at *48 (Fed. Cl. Spec. Mstr. Aug. 8, 2024) (onset of ADEM 53 days after vaccination); *Brown v. Sec'y of Health & Human Servs.*, No. 09-426V, 2011 WL 5029865, at *43-44 (Fed. Cl. Spec. Mstr. Sept. 30, 2011) (accepting onset of ADEM two months post-vaccination as an appropriate interval to infer causation ); *Doe 93 v. Sec'y of Health & Human Servs.*, 2011 WL 2326966, at *1 (Fed. Cl. Spec. Mstr. May 9, 2011) (citing *Doe 93 v. Sec'y of Health & Human Servs.*, No. [redacted], 2010 WL 4205677, at *25 (Fed. Cl. Spec. Mstr. Oct. 20, 2010), *vacated on other grounds*, 98 Fed. Cl. 553 (2011)) (finding an appropriate temporal relationship where the petitioner's TM was manifest approximately two months following the flu vaccine); *Fisher v. Sec'y of Health & Human Servs.*, No. 99-432V, 2009 WL 2365459, at *18 (Fed. Cl. Spec. Mstr. July 13, 2009) (onset of optic neuritis two months after the second dose of the hepatitis B vaccine accepted as an appropriate temporal interval for causation). These prior cases generally involved theories based on molecular mimicry, similar to this case.

Here, because I have found that petitioner did meet his burden under *Althen* prong one, respondent's sole argument under *Althen* prong three is moot. And, based on my review of the expert reports, respondent's experts never challenged petitioner's experts with regard to the expected timeframe for molecular mimicry to lead to demyelination. (*See* Exs. A, C, E-F, H.) Therefore, petitioner's showing under *Althen* prong three, which is consistent with the above cited cases, is unrebutted.

Accordingly, in light of the above, and considering the record as a whole, petitioner has met his preponderant burden of proof under *Althen* prong three.

iii. _*Althen* prong two_

The second *Althen* prong requires preponderant proof of a logical sequence of cause and effect, which is usually supported by facts derived from petitioner's medical records.[22] *Althen*, 418 F.3d 1278; *Andreu*, 569 F.3d at 1375-77; *Capizzano*, 440 F.3d at 1326; *Grant*, 956 F.2d at 1148. While the opinions of treating physicians are often favored, *Capizzano*, 440 F.3d at 1326, a petitioner may support a cause-in-fact claim through presentation of either medical records or an expert medical opinion. *See* § 300aa-13(a). The Federal Circuit has cautioned that the second *Althen* prong "is not without meaning," but has also indicated that satisfaction of *Althen* prongs one and three can be probative with respect to *Althen* prong two. *Capizzano*, 440 F.3d at 1326-27. Nonetheless, temporal association alone is not enough to satisfy petitioner's burden of proof. *See*, *e.g.*, *Veryzer v. Sec'y of Health & Human Servs.*, 100 Fed. Cl. 344, 356 (2011) (explaining that "a temporal relationship alone will not demonstrate the requisite causal link and that petitioner must posit a medical theory causally connecting [the] vaccine and injury"), *aff'd per curiam sub nom.*, *Veryzer v. United States*, 475 F. App'x 765 (Fed. Cir. 2012); *A.Y. v. Sec'y of Health & Human Servs.*, 152 Fed. Cl. 588, 595 (2021); *Forrest v. Sec'y of Health & Human Servs.*, No. 10-032V, 2017 WL 4053241, at *18 (Fed. Cl. Spec. Mstr. Aug. 10, 2017); *Cozart v. Sec'y of Health & Human Servs.*, No. 00-590V, 2015 WL 6746616, at *18 (Fed. Cl. Spec. Mstr. Oct. 15, 2015), *mot. for rev. denied*, 126 Fed. Cl. 488 (2016); *Crosby v. Sec'y of Health & Human Servs.*, No. 08-799V, 2012 WL 13036266, at *37 (Fed. Cl. Spec. Mstr. June 20, 2012).

Petitioner argues that he has demonstrated a logical sequence of cause and effect, because his post-vaccination presentation of TM is consistent with his experts' theory of causation. (ECF No. 77, pp. 102-03.) Moreover, it is further supported by the diagnostic impressions of his treating physicians and the course of treatment they pursued. (*Id.*) Petitioner stresses that his treating physicians repeatedly documented that his condition arose post-vaccination and further that they eventually listed the flu vaccine as an allergy in his medical chart. (*Id*. at 104-05.) Finally, petitioner highlights that, although respondent has contested his diagnosis of TM, respondent has not argued that any other potential cause of TM is in evidence. (*Id*. at 105.) Respondent does not raise any specific aspect of petitioner's presentation as confounding of a logical sequence of cause and effect; however, he stresses that it is not enough to

[22] Medical records are generally viewed as trustworthy evidence. *Cucuras*, 993 F.2d at 1528. These records are generally contemporaneous to the medical events and "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium." *Id.* However, medical records and/or statements of a treating physician's views do not *per se* bind the special master. § 300aa-13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) (reasoning that "nothing . . . mandates that the testimony of a treating physician is sacrosanct—that is must be accepted in its entirety and cannot be rebutted").

demonstrate temporality and/or eliminate alternative causes of injury. (ECF No. 79, p. 38.) Moreover, he stresses that the treating physician notations cited by petitioner are limited to documenting the fact that petitioner's alleged TM developed after vaccination. (*Id*. at 39.)

Respondent is correct that neither a proximate temporal relationship nor a simplistic elimination of other potential causes establishes causation-in-fact. *Althen*, 418 F.3d at 1278. However, these considerations are nonetheless still considered probative. *Id*. Moreover, the Circuit has also confirmed that evidence pertaining to *Althen* prongs one and three can assist petitioner in meeting his burden of proof under *Althen* prong two. *Capizzano*, 440 F.3d at 1326-27. Here, given that respondent has not raised any specific way in which petitioner's presentation is inconsistent with a logical sequence of cause and effect, these considerations carry significant weight. Additionally, while it is true that many of the medical record notations cited by petitioner merely reflect documentation that the vaccination preceded petitioner's TM, petitioner does also cite medical records confirming that his treating physicians ultimately listed the flu vaccine as an allergy for petitioner and specifically documented petitioner's TM as the reason for the allergy. (Ex. 21, p. 33; Ex. 100, pp. 67-70.) "A treating physician's decision to administer or withhold a vaccination can be highly probative of causation." *Tarsell v. United States*, 133 Fed. Cl. 782, 797 (2017) (citing *Andreu*, 569 F.3d at 1376). And, finally, petitioner's experts were also persuasive in explaining that petitioner's response to treatment initiated for TM further evidences that petitioner's condition was more likely to be inflammatory. (*E.g.*, Ex. 35, pp. 10-13; Ex. 62, pp. 6-7; Ex. 73, p. 9.)

Accordingly, in light of the above, and considering the record as a whole, petitioner has met his preponderant burden of proof under *Althen* prong two.

**c. Factor unrelated to vaccination**

Once petitioner has satisfied his own burden of proof, the burden shifts to respondent to demonstrate by a preponderance of the evidence that the injury was caused by factors unrelated to vaccination. § 300aa-13(a)(1)(B); *Deribeaux v. Sec'y of Health & Human Servs.*, 717 F.3d 1363, 1367-69 (Fed. Cir. 2013). Respondent has not presented any factor unrelated to vaccination as a potential cause of petitioner's TM. (*See* ECF No. 79.) To the extent respondent argued extensively that the cause of petitioner's condition was SCI related to his pre-existing cardiovascular risk factors (*Id.* at 20-31), this has already been addressed. *See* discussion *supra* Section V.a.

**d. This is a close case**

"The Vaccine Act does not contemplate full blown tort litigation in the Court of Federal Claims. The Vaccine Act established a federal 'compensation program' under which awards are to be 'made to vaccine-injured persons quickly, easily, and with certainty and generosity.'" *Knudsen*, 35 F.3d at 549. (quoting H.R. Rep. No. 99–908, 99th Cong., 2d Sess. 18, *reprinted in* 1986 U.S.C.C.A.N. 6344). Accordingly, the Federal Circuit has suggested that this program represents a "system created by

Congress, in which close calls regarding causation are resolved in favor of injured claimants." *Althen*, 418 F.3d at 1280. I do stress that there is preponderant evidence supporting petitioner's claim. However, I also note that the outcome in this case is consistent with the Federal Circuit's guidance regarding the generous and remedial nature of this program.

## VI. Conclusion

Accordingly, for all the reasons described above, petitioner is entitled to compensation for his TM which was caused-in-fact by the flu vaccination he received on October 10, 2017. A separate Damages Order will issue setting forth additional steps for the damages phase of this case.

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master